### In re AM INTERNATIONAL, INC., Debtor.

### MARCUS MONTGOMERY WOLFSON & BURTEN P.C., Ad Hoc Committee, of Equity Security Holders, Hellmold Associates, Appellants,

v.

### AM INTERNATIONAL, INC., Appellee.

### Civil Action No. 94–59–JJF.

United States District Court, D. Delaware.

Dec. 30, 1996.

---

Jeffery C. Wisler, Barbara Snapp Danberg, Williams Gordon & Martin P.A., Wilmington, Delaware. Peter D. Wolfson, Suzanne D.T. Lovett of Marcus Montgomery Wolfson P.C., New York City, for Appellants.

James L. Patton, Jr., Brendan Linehan Shannon, Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, for Appellee.

## *OPINION*

FARNAN, Chief Judge.

## I. INTRODUCTION

Presently before the Court is the Appeal of Marcus Montgomery Wolfson & Burten P.C., Hellmold Associates, Inc., and Don Geong and Sy Cohen (the "Appellants") (D.I. 9). Appellants appeal as of right from the denial of their Request for Compensation and Reimbursement of Expenses pursuant to 11 U.S.C. §§ 503(b)(3)(D) and (b)(4) (the "Section 503(b) Applications") by the United States Bankruptcy Court for the District of Delaware in the bankruptcy proceeding of *In re AM International, Inc.*, No. 93–582 (Bankr.D.Del. Dec. 13, 1993).

Appellants contend that the Bankruptcy Court erred in denying their request for compensation and reimbursement of expenses because (1) Appellants met the standard of "substantial contribution to a case" under Section 503(b) (D.I. 9 at 5); (2) the Bankruptcy Court erroneously failed to reconsider the Section 503(b) Applications in light of its own ruling on the identical issues in *In re Columbia Gas Transmissions Corp.*, No. 91–804 (Bankr.D.Del. July 13, 1993) (D.I. 9 at 6); and (3) the Bankruptcy Court erred in finding that the Series A Warrants created by Appellants did not contribute value to the case and in refusing to reconsider its finding in light of new evidence (D.I. 9 at 6).

In response, Appellee AM International ("AMI") contends that (1) Appellants have not met the standard under Section 503(b) of establishing "substantial contribution"; (2) Appellants have failed to establish that the warrants have value (D.I. 17 at 6–15); (3) Appellants have failed to establish that any benefit accrued to the estate from their services (D.I. 15–19); (4) the Bankruptcy Court's earlier decision in *In re Columbia Gas* is factually distinguishable from this action (D.I. 17 at 19); and (5) the Bankruptcy Court's prior decisions are not binding on its subsequent decisions (D.I. 17 at 20–22).

## II. JURISDICTION

The Bankruptcy Court's denial of Appellants' Section 503(b) Applications was a final order and is therefore appealable as of right. 28 U.S.C. §§ 158, 1292(a)(1) (1991). This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a).

## III. BACKGROUND

AMI supplies equipment to fold, staple, collate and insert materials used in the newspaper and magazine industry. Equity shareholders held approximately 3.4 million shares of publicly traded preferred stock with a liquidation value of almost $90 million and approximately 47 million shares of publicly traded common stock.

In December, 1992, AMI announced that it would default on payment of interest to its bondholders. Shortly thereafter, an ad hoc committee ("the Pre–Petition Committee"), consisting exclusively of bondholders holding AMI's Senior Subordinated Debentures and the indenture trustee, was formed for the purpose of negotiating the terms of a restructuring with AMI. (Appendix ("App.") at 694, 702–703). The equity shareholders were not invited to participate, and were accordingly not represented.

On May 17, 1993, AMI filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and submitted a plan of reorganization (the "Proposed Plan"). The Proposed Plan would distribute 97% of the stock of the reorganized entity to the holders of the Senior Subordinated Discount Notes, and only 3% of the new stock to the equity shareholders. Of the 3% of new stock, the Proposed Plan further specified that the preferred stockholders would receive 2% of the new stock and the common stock holders would receive 1% of the new stock. Overall, the Proposed Plan undervalued AMI and threatened to extinguish the interests of the equity shareholders (i.e. preferred and common stockholders), while providing a windfall to bondholders and management, who were slated to receive virtually all of the stock of the reorganized debtor. (App. at 706–708, 743–745).

The Proposed Plan and the imbalance which would result from it reflected the sophistication and expertise of its creators. Both AMI and its Official Committee of Unsecured Creditors (the "Creditors Committee") were very sophisticated bankruptcy players who were represented by seasoned bankruptcy practitioners. In addition, because the Creditors Committee was comprised primarily of the members of the Pre–Petition Committee, it was well informed of AMI's situation. Moreover, AMI, itself, was very familiar with the bankruptcy process, because it had previously reorganized under the Bankruptcy Code within the last ten years. *See In re AM International,* No. 82 B 4922 (Bankr.D.Ill.1984). In contrast to the sophistication and organization of AMI and its Creditor's Committee, the equity share-

holders were mostly individuals who held a small amount of shares, were widely scattered and were without an official representative.

Because of its sophistication in the bankruptcy area, AMI worked through the bankruptcy process with great speed. For example, AMI and its management scheduled the disclosure statement hearing less than three months after the petition date and the confirmation hearing only one month thereafter, with incentives and bonus arrangements to be paid to management relative to the speed with which the Debtor emerged from bankruptcy. (App. at 743–45). This rapid pace served to further disadvantage the already less sophisticated and less organized equity shareholders.

However, a small group of common and preferred equity shareholders, the Appellants herein, who were frustrated with the lack of equity representation in the restructuring process, followed AMI's pre-petition and post-petition activities in the press and through AMI's publicly filed documents. Appellants believed that the Proposed Plan grossly undervalued the going concern and liquidation value of AMI and perceived a need for official representation in AMI's bankruptcy proceedings. In an attempt to obtain official representation, Appellants petitioned the United States Trustee to appoint a separate, official equity committee to represent their interests. On July 7, 1993, the U.S. Trustee informed Appellants' counsel of his decision not to appoint a separate official equity committee.

After their request for representation was denied, Appellants created an ad hoc committee of equity shareholders (the "Ad Hoc Equity Committee"). The Ad Hoc Equity Committee again petitioned the United States Trustee for an order directing the appointment of an official committee of equity security holders. In preparation for this petition and the hearing that resulted from it, the Ad Hoc Equity Committee retained the services of Ralph O. Hellmold, President of Hellmold Associates, Inc., to perform an exhaustive analysis of AMI's financial statements and disclosures. In addition, the Ad Hoc Equity Committee met frequently with the law firm

Marcus Montgomery Wolfson & Burten ("MMWB") for assistance in preparing for the hearing.

The Ad Hoc Equity Committee's petition for an official equity committee was fiercely opposed by AMI, the Creditor's Committee and the Trustee. In support of their opposition, AMI, the Creditor's Committee and the Trustee argued that: (1) the appointment of an official committee was unnecessary because the results of the Debtor's case were a foregone conclusion, (2) the appointment of such a committee would only delay the confirmation of a plan, and (3) the committee would then be eligible to seek fees pursuant to Section 503(b). (App. 151, 132, 108, 109, 114).

On July 30 and August 2, 1993, the Bankruptcy Court held a hearing on the Ad Hoc Committee's motion for an order authorizing the U.S. Trustee to appoint an official committee of equity shareholders. At the hearing, Hellmold testified on behalf of the shareholders concerning the solvency of AMI. Finding that there was a considerable question as to whether AMI was in fact insolvent, the court granted the Ad Hoc Equity Committee's motion and directed the appointment of an official committee of equity shareholders (the "Official Equity Committee").

Thereafter, with the assistance of Hellmold and MMWB, the Official Equity Committee was ultimately successful in negotiating a settlement with the Debtor and Creditor's Committee. This settlement was incorporated into the consensual plan of reorganization and included the introduction of Series A Warrants. The Series A Warrants and the warrant structure provided for in the settlement would allow holders of AMI Preferred Stock to exercise an aggregate of 1,095,000 warrants at $18 per share within three years of the effective date of the plan.

After confirmation of AMI's plan, which incorporated the warrant structure, all parties submitted final applications to the Bankruptcy Court for compensation of fees and reimbursement of expenses. In their applications, Appellants argued that they were entitled to Section 503(b) fees and reimbursement on the grounds that (1) the Official Equity Committee added a significant amount of necessary information to AMI's disclosure statement and (2) the Official Equity Committee created additional value for equity shareholders and the estate as a whole through the development of the Series A warrants. (App. at 1271) (Bankr.Tr., *In the Matter of AM International, Inc.*, Case No. 93–582 (Bankr.D.Del. December 8, 1993)).

On December 8, 1993, the Bankruptcy Court held a hearing on the fee applications. Although Hellmold did not testify on behalf of Appellants at the fee applications hearing, he valued the warrants between $3.9 million and $12.3 million. MMWB valued the warrants at $19,000,710. However, AMI's witness valued the warrants at a "de minimis" value. (App. at 856–868).

At the hearing, the Bankruptcy Court denied Appellants' fee applications on the grounds that: (1) a significant amount of information was not missing from the disclosure and (2) the added value of the Series A warrants was questionable. (App. at 1271–72). Although it acknowledged that the Official Equity Committee succeeded in removing an alleged illegal roll-up provision, the Bankruptcy Court concluded that this did not add value to the estate and could have been struck down by the court in any case. (App. at 1272–73). In reaching this conclusion, the Bankruptcy Court refused to adopt the findings of the Hellmold valuation. (App. at 1273). Accordingly, the Bankruptcy Court concluded that the activities of the Official Equity Committee added no tangible, additional value for equity shareholders and the estate as a whole. (App. at 1273–74). In addition, the Bankruptcy Court rejected Hellmold's application on the separate ground that he failed to fulfil the definition of accountant or attorney, as required by the statute. (App. at 1274).

On December 9, 1993, the day after the Bankruptcy Court's denial of the application fees, the warrants were advertised by AMI and traded at $1–3/8 on the American Stock Exchange. Since that time, the existing present market value of the warrants in the hands of the equity holders has been estimated at $1.5 million.

Given this information, Appellants filed a Motion for Reconsideration concerning the denial of the Section 503(b) Applications on December 23, 1993. Appellants argued that the new evidence of the warrants' trading value, as well as the disposition of factually identical issues in the Bankruptcy Court's earlier decision *Columbia Gas,* warranted reconsideration. By an Order dated January 4, 1994, the Bankruptcy Court denied the Motion for Reconsideration. On January 11, 1994, Appellants filed their Notice of Appeal in this Court, seeking compensation and expenses from AMI in an amount exceeding $170,000.

## IV. STANDARD OF REVIEW

■ As a threshold matter, the parties dispute the correct standard of review that this Court should apply to the issues presented in this Appeal. Appellants contend that the correct standard of review is *de novo,* because the issues involve questions of law or mixed questions of law and fact. (D.I. 9 at 4). However, AMI argues that the correct standard of review is the clearly erroneous standard, because the Bankruptcy Court made a finding of fact in its determination that the Appellants' actions did not meet the standard of "substantial contribution." (D.I. 17 at 2).

■ The question of whether acts undertaken by an actor give rise to substantial contribution under Section 503(b)(3)(D) of the Bankruptcy Code is a question of law for the court, and accordingly, is examined on appeal under a *de novo* standard of review. *See In re Flight Transportation Corp. Sec. Litig.,* 874 F.2d 576, 580, 582–83 (8th Cir. 1989). However, whether the acts give rise to a substantial contribution is a different question from the determination of which facts should be considered in the substantial contribution analysis. The selection of the proper facts to consider in the substantial contribution analysis is a question of fact reviewed under the clearly erroneous standard. *Lebron v. Mechem Financial Inc.,* 27 F.3d 937, 946 (3d Cir.1994); Bankr.Rule 8013.

Although the Court acknowledges that there was an underlying factual dispute con-

cerning the valuation of the warrants, the question of the warrants' valuation is a different question than the question of whether the actions of the Official Equity Committee substantially contributed to the estate. As far as the question of whether the Official Equity Committee contributed substantially to the estate, there was no factual dispute before the Bankruptcy Court. The Appellees did not contest the Motion, and the Bankruptcy Court made no findings of fact. In fact, the Bankruptcy Court specifically refused to review the changes that the Debtor made to its disclosure as a result of the Appellants' endeavors, or hear testimony concerning whether the Appellants' actions added value to the estate. (App. at 1271–72). Moreover, the Bankruptcy Court, itself, characterized the issue of whether or not the facts met the standard of substantial contribution under Section 503(b)(3)(D) as a "legal issue." (App. at 1271). The Bankruptcy Court simply applied the facts asserted by the Appellants to conclude that the facts, as argued, did not meet the standard for substantial contribution.

■ However, even if the question of whether the acts of the Appellants met the standard of substantial contribution under Section 503(b)(3)(D) is not strictly a question of law, it is, at a minimum, a mixed question of law and fact. Like questions of law, mixed questions of law and fact also require a *de novo* standard of review on appeal. *See Meridian Bank v. Alten,* 958 F.2d 1226 (3d Cir.1992) (stating that court must break down mixed question of law and fact and examine legal component de novo, affirming factual conclusions unless clearly erroneous). However, mixed questions of law and fact are difficult to define, and are generally found where there is at least some factual adjudication of disputed facts. As stated earlier, the Bankruptcy Court did not make any factual findings regarding the question of whether the Official Equity Committee contributed substantially to the estate. In sum, the Court concludes that the question before the Bankruptcy Court was one of law, and will be reviewed under the *de novo* standard of review.

## V. DISCUSSION

### A. Section 503(b)

▮ Section 503(b)(3)(D) provides that

(b) after notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including—

\* \* \* \* \* \*

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

\* \* \* \* \* \*

(D) ... an equity security holder, or a committee representing ... equity security holders ... in making a substantial contribution in a case under chapter ... 11 of this title....

\* \* \* \* \* \*

(E)(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection ...

11 U.S.C. § 503(b)(3)(D). Therefore, an equity holder, a committee representing equity holders, or an attorney or accountant working on their behalf may be awarded fees and expenses provided that they establish that they: (1) made a substantial contribution, (2) in a case under Chapter 11.

▮ At issue is the first element under Section 503(b)(3)(D), whether Appellants made a substantial contribution sufficient to entitle them to administrative expenses. The applicable test to determine whether a party has made a "substantial contribution" entitling him to administrative expenses pursuant to Section 503(b)(3)(D) is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors. *Lebron v. Mechem Financial, Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) (citations omitted). Even though a benefit may have been conferred to the estate, reimbursement should be excluded where the activities primarily served the interest of the interested parties, and would not have been undertaken absent an expecta-

tion of reimbursement from the estate. *Id.* In other words, the acts must have been designed to benefit others who would foreseeably be interested in the estate. *Id.* at 946. In the absence of such a finding, there can be no award of expenses even though there may have been a benefit to the estate. *Id.*

In support of their assertion that they made a "substantial contribution" to the estate, Appellants have convincingly set out the gloomy position the AMI equity shareholders found themselves in vis-a-vis the "pre-packaged" plan filed by AMI. Of course, the position of AMI shareholders is not unlike that of shareholders in most of the reorganizations that the Court has had the opportunity to review, including those in the Bankruptcy Court's decision *In re Columbia Gas Transmissions Corp.*, No. 91–804 (Bankr. D.Del. July 13, 1993), discussed *supra.* Generally speaking, most observers and participants in financial markets expect that shareholders knowingly put their money at risk, and therefore, should anticipate the treatment usually afforded them upon the financial demise of a business.

In this reorganization, the "pre-arranged" Proposed Plan created by the Creditors Committee distributed 97% of the stock of the reorganized entity to the holders of the Senior Subordinated Discount Notes, and only 3% of the new stock to the equity security holders: 2% to holders of preferred stock and 1% to holders of common stock. (App. at 743–45). Unhappy with this plan, the shareholders worked initially through the Ad Hoc Equity Committee, and ultimately through the Official Equity Committee, to create a warrant structure by which the holders of AMI preferred stock could exercise an aggregate of 1,095,000 warrants within three years of the effective date of the plan. This arrangement permitted the Creditors Committee to recoup all of their claims before shareholders could begin to attempt to get any value from AMI. Moreover, the warrant structure also provided AMI with a potential source of equity after all the warrants had been exercised. Finally, the warrants themselves could increase investor interest in the

company by the trading of an additional security of AMI.

On this record, the Court concludes that the items negotiated by the Official Equity Committee were of significant value to the estate, and, under a strict application of Section 503(b)(3)(D), the Court is persuaded that Appellants contributed substantially. As Appellants point out, the warrants have value to the estate that was clearly not available in the prepackaged plan. The Court is convinced that through the work of the Ad Hoc Equity Committee and the Official Equity Committee, the Appellants not only broke through the typical and normal process of pre-packaged reorganization, but also contributed substantially to the estate.

### B. *Columbia Gas* as Precedent

Appellants also contend that the Bankruptcy Court erroneously failed to reconsider its decision in light of its own ruling on virtually the identical issues in *In re Columbia Gas Transmissions Corp.*, No. 91–804 (Bankr.D.Del. July 13, 1993). On the question of precedent, Circuit Judge Mansmann clearly staked out this Circuit's Rule in *Threadgill v. Armstrong World Industries, Inc.*, 928 F.2d 1366 (3d Cir.1991) when she opined:

> First, it is clear that there is no such thing as "the law of the district." Even where the facts of a prior district court case are, for all practical purposes, the same as those presented to a different district court in the same district, the prior "resolution of those claims does not bar reconsideration by this Court of similar contentions. The doctrine of stare decisis does not compel one district court judge to follow the decision of another." *State Farm Mutual Automobile Insurance Co. v. Bates*, 542 F.Supp. 807, 816 (N.D.Ga.1982) [other citations omitted]. Where a second judge believes that a different result may obtain, independent analysis is appropriate. *Id.*

*Threadgill*, 928 F.2d at 1371.

Pursuant to the *Threadgill* decision, *Columbia Gas* may not be binding precedent upon this Court. However, the Court is persuaded that the circumstances of the instant case require that the result of *Columbia Gas* deserves some deference on the basis of consistency and common sense, if not binding precedent. In *Columbia Gas,* the Bankruptcy Court granted counsel's Section 503(b) applications on the grounds that obtaining an appointment of an equity committee made a substantial contribution to the estate. Although the Bankruptcy Court is not bound by its previous decisions, the Court concludes that the reasoning of *Columbia Gas* is correct. Like counsel in *Columbia Gas,* the Court concludes that Appellants contributed substantially to the estate not only by the creation and appointment of an equity committee, but also by virtue of the results they achieved as detailed previously.

Because the Court has concluded that Appellants have met the standard of Section 503(b)(3)(D), the Court need not address the other issues raised in this Appeal.

### VI. CONCLUSION

For the reasons discussed, the Court will reverse the decision of the Bankruptcy Court and grant the Section 503(b)(3)(D) Application of Marcus Montgomery Wolfson & Burten P.C., Hellmold Associates, Inc., and Don Geong and Sy Cohen.

An appropriate Order will be entered.