**In re GRANITE PARTNERS, L.P., Granite Corporation, and Quartz Hedge Fund, Debtors.**

**Bankruptcy Nos. 94 B 41683 (SMB) to 94 B 41685 (SMB).**

United States Bankruptcy Court, S.D. New York.

Oct. 6, 1997.

Harrison J. Goldin, Goldin Associates, L.L.C., New York City, Trustee.

Berlack, Israels & Liberman LLP (Steven E. Greenbaum, Edward S. Weisfelner, of counsel), New York City, for the Unofficial Investors' Committee.

Cleary Gottlieb Steen & Hamilton (Thomas J. Moloney, Robin A. Henry, Carmine D. Boccuzzi, Jr., of counsel), New York City, for Kidder Peabody & Co., Inc.

Gold Bennett & Cera LLP (Solomon B. Cera, Susan D. Resley, of counsel), San

**444**

Francisco, CA, Bernstein Litowitz Berger & Grossmann LLP (Jeffrey A. Klafter, Robert S. Gans, of counsel), New York City, for Primavera Familienstiftung and Hubert Looser.

Morgan, Lewis & Bockius LLP (Gary G. Staab, of counsel),New York City, for Donaldson, Lufkin & Jenrette Securities Corporation.

Shereff, Friedman, Hoffman & Goodman, LLP, Reid & Priest (Andrew J. Levander, Shalom Jacob, Marc E. Richards,of counsel), New York City,for David J. Askin, Askin Capital Management, L.P. and Dashstar Corporation.

Carolyn Schwartz, United States Trustee (Diana G. Adams, Assistant United States Trustee, of counsel), New York City.

## MEMORANDUM DECISION REGARDING SUBSTANTIAL CONTRIBUTION APPLICATIONS

STUART M. BERNSTEIN, Bankruptcy Judge.

Sections 503(b)(3)(D) and 503(b)(4) authorize a bankruptcy court to award legal fees and reimburse expenses incurred by creditors who make a substantial contribution to the case. Three law firms have applied for compensation and reimbursement under these provisions. For the reasons that follow, the law firm of Berlack, Israels & Liberman ("Berlack") is entitled to an award, but the determination of the actual amount must await further proceedings. The other requests are denied.

### BACKGROUND

The background to these cases is described in *Goldin v. Primavera Familienstiftung (In re Granite Partners, L.P.)*, 194 B.R. 318 (Bankr.S.D.N.Y.1996) ("*Granite I* "), *In re Granite Partners, L.P.*, 208 B.R. 332 (Bankr. S.D.N.Y.1997) ("*Granite II* ") and *ABF Capital Management v. Kidder Peabody & Co., Inc. (In re Granite Partners, L.P.)*, 210 B.R. 508 (Bankr.S.D.N.Y.1997) ("*Granite III* "). Briefly, the debtors invested in collateralized mortgage obligations ("CMO") created and sold by several broker dealers. The debtors raised capital through the sale of shares in Granite Corporation and Quartz Hedge Fund and limited partnership interests in Granite partners to outside investors. The debtors raised, in total, approximately $400 million from some 130 entities.

In early 1994, interest rates rose and the value of the debtors' CMO investments dropped. The debtors had pledged a substantial amount of their securities as collateral for margin loans made by the brokers, and when the value of the collateral fell, the lending brokers made margin calls. The debtors could not meet these margin calls, and the brokers liquidated the collateral. Eventually, the debtors' businesses collapsed in late March and early April 1994, and they ceased to operate.

The debtors filed these chapter 11 cases on April 7, 1994. The United States Trustee appointed an official committee of unsecured creditors (the "Committee") consisting of six brokers. The six included Kidder, Peabody & Company, Inc. ("Kidder") and Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ"), two brokers singled out as bearing some responsibility for the debtors' demise. The United States Trustee declined a request, however, to appoint an official committee of equity interest holders.

Shortly after the commencement of the case, I appointed Harrison J. Goldin, Esq. as chapter 11 trustee to conduct an investigation and render a report.[1] *See* 11 U.S.C. § 1106(b). He had several obvious targets. Some charged that David Askin and Askin Capital Management, L.P. ("ACM"), insiders of the debtors, engaged in inappropriate trading strategies and mismanaged the debtors and their assets. Others alleged that the brokers created and sold inappropriate securities to the debtors, improperly loaned the debtors the money to buy these securities, improperly liquidated the collateral pledged by the debtors and aided and abetted the wrongful acts committed by the debtors' insiders. Many, particularly the debtors'

---

1. Mr. Goldin rendered his final report on April 18, 1996.

shareholders and limited partners, blamed both.[2]

The trustee eventually confirmed a joint plan of liquidation in March, 1997, garnering the acceptance of the diverse and often antagonistic constituencies. The road to confirmation was not a smooth one. The substantial contribution claimants take some degree of credit for the ultimate success of these cases, and now seek to recover their legal fees and expenses.[3] Before considering the nature of their contributions, it is worthwhile to review the principles that govern substantial contribution claims.

## DISCUSSION

### A. The Substantial Contribution Award

#### 1. The Nature of Substantial Contribution

Section 503 of the Bankruptcy Code authorizes the bankruptcy court to award compensation to creditors for their legal and other expenses incurred in making a substantial contribution to the case. The section provides, in pertinent part, as follows:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

. . . .

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

. . . .

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title.

. . . .

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.

■ Compensation based on substantial contribution is designed to promote meaningful participation in the reorganization process, but at the same time, discourage mushrooming administrative expenses. *In re Best Products Co.*, 173 B.R. 862, 865 (Bankr. S.D.N.Y.1994); *In re Alert Holdings, Inc.*, 157 B.R. 753, 757 (Bankr.S.D.N.Y.1993); *In re United States Lines, Inc.*, 103 B.R. 427, 429 (Bankr.S.D.N.Y.1989), *aff'd*, No. 90 Civ. 3823, 1991 WL 67464 (S.D.N.Y. Apr.22, 1991); *In re Baldwin–United Corp.*, 79 B.R. 321, 338 (Bankr.S.D.Ohio 1987). Accordingly, the substantial contribution provisions must be narrowly construed, *In re United States Lines, Inc.*, 103 B.R. at 429; *In re Baldwin–United Corp.*, 79 B.R. at 336, and do not change the basic rule that the attorney must look to his own client for payment. *In re Best Products Co.*, 173 B.R. at 866; *In re Alert Holdings, Inc.*, 157 B.R. at 757; *In re United States Lines, Inc.*, 103 B.R. at 430; *In re McLean Industries, Inc.*, 88 B.R. 36, 38 (Bankr.S.D.N.Y.1988); *In re General Oil Distributors, Inc.*, 51 B.R. 794, 806 (Bankr. E.D.N.Y.1985).

■ Extensive participation alone is insufficient to justify an award. *In re Best Products Co.*, 173 B.R. at 866; *In re Alert Holdings, Inc.*, 157 B.R. at 757; *In re United States Lines, Inc.*, 103 B.R. at 430; *In re McLean Industries, Inc.*, 88 B.R. at 38. Rather, compensation is limited to those extraordinary actions, *In re Best Products Co.*, 173 B.R. at 866; *In re Alert Holdings, Inc.*, 157 B.R. at 757, that lead to an "actual and demonstrable benefit to the debtor's estate, the creditors, and to the extent relevant, the stockholders." *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 569 (Bankr.D.Utah

---

2. The investors' claims are described and were considered in *Granite I*, 194 B.R. 318, and *ABF Capital Management v. Askin Capital Management, L.P.*, 957 F.Supp. 1308 (S.D.N.Y.1997).

3. Since the claimants only seek legal fees and expenses, and the applications were submitted by the attorneys, I sometimes refer to the claimants and their counsel interchangeably.

1985); *accord In re Lister,* 846 F.2d 55, 57 (10th Cir.1988); *In re AM Int'l, Inc.,* 203 B.R. 898, 904 (D.Del.1996); *In re Best Products Co.,* 173 B.R. at 865; *In re Alert Holdings, Inc.,* 157 B.R. at 757; *In re 9085 E. Mineral Office Bldg., Ltd.,* 119 B.R. 246, 252 (Bankr.D.Colo.1990); *In re United States Lines, Inc.,* 103 B.R. at 429; *In re Texaco, Inc.,* 90 B.R. 622, 630 (Bankr.S.D.N.Y.1988); *In re McLean Industries, Inc.,* 88 B.R. at 39; *In re General Oil Distributors, Inc.,* 51 B.R. at 806. Compensable services foster and enhance—rather than retard and interrupt—the progress of reorganization. *In re Best Products Co.,* 173 B.R. at 865; *In re Alert Holdings, Inc.,* 157 B.R. at 757; *In re United States Lines, Inc.,* 103 B.R. at 429; *In re Richton Int'l Corp.,* 15 B.R. 854, 856 (Bankr. S.D.N.Y.1981).

■■■ Conversely, insubstantial services include those that do not actually increase the size of the estate, *In re United States Lines, Inc.,* 103 B.R. at 429, or deplete the assets of the estate without providing any corresponding greater benefit. *In re Alert Holdings, Inc.,* 157 B.R. at 757; *In re United States Lines, Inc.,* 103 B.R. at 429; *see In re DP Partners Ltd. Partnership,* 106 F.3d 667, 673 (5th Cir.) (court should weigh the cost of the claimed fees and expenses against the benefits to the estate that flow directly from those actions), *petition for cert. denied,* —— U.S. ——, 118 S.Ct. 63, —— L.Ed.2d —— (1997). Services that duplicate those rendered by the debtor or other court appointed officers, absent proof that they are unwilling or unable to act, are not compensable because they entail an excessive and undue burden on the estate. *In re United States Lines, Inc.,* 103 B.R. at 429; *In re Baldwin–United Corp.,* 79 B.R. at 338. A court may also consider whether the applicant's noncompensable activities increased the administrative costs to the estate. *See In re Alert Holdings, Inc.,* 157 B.R. at 759; *In re Baldwin–United Corp.,* 79 B.R. at 339. Finally, services calculated primarily to benefit the client do not justify an award even if they also confer an indirect benefit on the estate. *In re United States Lines, Inc.,* 103 B.R. at 430; *In re Calumet Realty Co.,* 34 B.R. 922, 926–27 (Bankr.E.D.Pa.1983); *see In re Rockwood Computer Corp.,* 61 B.R. 961, 966 (Bankr.S.D.Ohio 1986); *but cf. In re DP Partners Ltd. Partnership,* 106 F.3d at 673 (creditor's motive irrelevant).

The concept of substantial contribution awards originated under chapter X of the former bankruptcy act, *In re United States Lines, Inc.,* 103 B.R. at 429; *In re Texaco, Inc.,* 90 B.R. at 627; *In re Baldwin–United Corp.,* 79 B.R. at 338, and such awards were limited to services that contributed to the confirmation of the plan or to the refusal to confirm a plan where the refusal benefitted the estate. *See* H.R.Rep. No. 95–595, at 355 (1977); S. Rep. 95–989, at 66–67 (1978). The Bankruptcy Code continues this approach. The handful of Code cases awarding substantial contribution have generally done so in one of two situations. First, the creditor took an active role in facilitating the negotiation and successful confirmation of the plan. *See, e.g., In re 9085 E. Mineral Office Bldg. Ltd.,* 119 B.R. at 253 (secured creditor proposed and confirmed plan that paid unsecured creditors 100%); *In re Baldwin–United Corp.,* 79 B.R. at 343 (creditor's counsel acted as the voice of reason in an otherwise contentious case); *In re Richton Int'l Corp.,* 15 B.R. at 856 (creditor's lawyer "facilitated the progress of these cases and ... substantially aided the formulation and adoption of the Plan of Reorganization"); *cf. In re Best Products Co.,* 173 B.R. at 867 (court may consider whether significant creditor has agreed to take less to achieve a consensual plan). Second, the creditor opposed an earlier plan, and as a result, the court ultimately confirmed a more favorable plan. *See, e.g., In re DP Partners Ltd. Partnership,* 106 F.3d at 673 (creditor's participation in confirmation fight caused debtor to change plan and resulted in a $3 million benefit to all creditors); *In re AM Int'l, Inc.,* 203 B.R. at 904–05 (*ad hoc* equity committee successfully opposed pre-packaged plan that wiped out equity, and negotiated new plan, containing warrant structure, that added value to the estate and benefitted all constituencies); *Ex parte Roberts,* 93 B.R. 442, 444–46 (D.S.C. 1988) (creditor opposed plan that did not pay interest to unsecured creditors, and debtor eventually proposed and confirmed a plan that paid $75,000.00 in interest); *cf. In re*

*Texaco, Inc.,* 90 B.R. at 627–29 (attorneys who filed prepetition derivative action insisted on additional disclosure regarding third party releases under plan, ultimately protecting the interests of and adding to potential value for all shareholders).

In addition, some courts have gone beyond these traditional limits. They have granted substantial contribution awards, without regard to the plan process, where the creditor's activities have led to a concrete, measurable monetary benefit, *In re McLean Industries, Inc.,* 88 B.R. at 39 (objection to a proposed sale of estate property for $350,000 prompted other objections and an increased bid of $1.5 million); *In re Baldwin–United Corp.,* 79 B.R. at 344 (plan to purchase debtors' asset drew a competing bid, $5 million higher, which the debtors eventually accepted), or saved expenses. *See, e.g., In re 9085 E. Mineral Office Bldg., Ltd.,* 119 B.R. at 255 (objection to fee application resulting in $11,000.00 reduction).

## 2. Burden of Proof

▮▮▮▮ The applicant bears the burden of proving, by a preponderance of the evidence, that he has rendered a substantial contribution. *In re Lister,* 846 F.2d at 57; *In re Best Products Co.,* 173 B.R. at 865; *In re Alert Holdings, Inc.,* 157 B.R. at 757; *In re United States Lines, Inc.,* 103 B.R. at 429; *In re Baldwin–United Corp.,* 79 B.R. at 336. The applicant must demonstrate a "credible connection" between his efforts and the reorganization process. *In re Calumet Realty Co.,* 34 B.R. at 926. The court may consider corroborating testimony as well as its firsthand observations of services. *In re United States Lines, Inc.,* 103 B.R. at 430. Finally, the same documentation and substantiation requirements apply to substantial contribution claims as apply to requests for compensation under section 330. *In re Baldwin–United Corp.,* 79 B.R. at 336.

## 3. A Comparison Between Sections 330 and 503

▮▮▮▮ Bankruptcy law views substantial contribution and ordinary fee applications by court-authorized counsel under 11 U.S.C. § 330(a)[4] quite differently. The substantial contribution test is applied in hindsight, and scrutinizes the actual benefit to the case. Accordingly, the applicant must show a "causal connection" between the service and the contribution. *In re DP Partners Ltd. Partnership,* 106 F.3d at 673. In contrast, the section 330 test looks forward, and considers "what services a reasonable lawyer or legal firm would have performed in the same circumstances." *In re Ames Dep't Stores, Inc.,* 76 F.3d 66, 72 (2d Cir.1996) (citing *In re Taxman Clothing Co.,* 49 F.3d 310, 315 (7th Cir.1995) (Posner, C.J.)); *accord In re Keene Corp.,* 205 B.R. 690, 696 (Bankr.S.D.N.Y. 1997); *In re Drexel Burnham Lambert Group, Inc.,* 133 B.R. 13, 23 (Bankr.S.D.N.Y. 1991). The court does not examine a fee application under section 330 through hindsight, 3 Lawrence P. King, *et al., Collier on Bankruptcy* ¶ 330.04[1][b][iii], at 330–32 (rev. 15th ed. 1997) (*"Collier"*), and considerations of the benefits and results obtained have been deemphasized. *In re 9085 E. Mineral Office Bldg., Ltd.,* 119 B.R. at 252 n. 16. Finally, an award under section 330 is the general rule, but a substantial contribution award is the exception.

## B. Primavera Familienstiftung and Hubert Looser

Gold, Bennett & Cera LLP (the "Gold Firm") and Bernstein, Litowitz, Berger & Grossman LLP, are the attorneys who represented Primavera Familienstiftung ("Primavera") and Hubert Looser.[5] The firms seek

---

4. The pre-Bankruptcy Reform Act version of 11 U.S.C. § 330(a), which continues to apply to this case, states:

> After notice to any parties in interest and to the United States trustee and a hearing ... the court may award to a ... professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—
>
> (1) reasonable compensation for actual, necessary services ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and
>
> (2) reimbursement for actual, necessary expenses.

5. Primavera invested $1 million in Granite Corporation, and Looser invested $1.4 million in Quartz. *Granite II,* 208 B.R. at 334 n. 4. Since

substantial contribution awards for fees and expenses in the aggregate sum of $108,-102.57.[6] Postpetition, Primavera filed a class action, presently pending before Judge Robert W. Sweet of the United States District Court for the Southern District of New York, to recover damages from the debtors' insiders and several brokers, including Kidder, DLJ and Bear, Stearns & Co., Incorporated ("Bear, Stearns"). *See Primavera Familienstiftung v. Askin,* 95 Civ. 8905, 1996 WL 494904 (S.D.N.Y. Aug. 30, 1996) (dismissing all but one claim in Primavera's second amended complaint); *Primavera Familienstiftung v. Askin,* 95 Civ. 8905, 1996 WL 580917 (S.D.N.Y. Oct. 9, 1996) (granting reargument and dismissing remaining claim in second amended complaint, with leave to replead); *Primavera Familienstiftung v. Askin,* 173 F.R.D. 115 (S.D.N.Y.1997) (denying broker's and ACM's motion to dismiss Primavera's third amended complaint). Its class has never been certified. Primavera has participated often in these cases, but not always voluntarily. The applicants have identified three areas in which they believe that they made a substantial contribution. Every party in interest, other than the trustee who took no position, strenuously objects to any award.

## 1. The Adversary Proceeding

 Sometime after Primavera commenced its district court action against the debtors' insiders and the brokers, the trustee sued Primavera in this Court. He sought an injunction against the continued prosecution of Primavera's district court action, contend-

ing that it violated the automatic stay, but in any event, should be enjoined under 11 U.S.C. § 105(a).[7] In *Granite I,* I enjoined the continued prosecution of certain claims that belonged to the estate, and refused to enjoin the continued prosecution of other claims either because they belonged personally to Primavera and the proposed members of the class or because the doctrine of *in pari delicto* prevented the trustee from asserting them.

The applicants devoted $34,265.00 in billable time defending the adversary proceeding, *Application of Gold Bennett & Cera LLP and Bernstein Litowitz Berger & Grossman LLP for Compensation for Services Rendered and Reimbursement of Expenses,* dated April 21, 1997 ("*Primavera App.*"), at 5 n. 7, and now seek an award of substantial contribution for these services.[8] They state that the *Granite I* decision provided a "benchmark" for determining estate and nonestate claims, and conclude that their work "substantially contributed to the estates by clarifying for them and all other interested parties the scope of the Trustee's ability to sue on behalf of the estates," (*id.* at 5–6), and "by identifying for the benefit of all creditors and all shareholders of the debtors the extent of the rights of the estate and the shareholders to litigate claims arising out of the collapse of the Granite Funds." (*Id.* at 6 n. 10.)

This is like maiming a person, losing the ensuing lawsuit, and then demanding kudos for clarifying the law of battery. Primavera's assertion of estate claims violated the automatic stay. *See In re Crysen/Montenay*

neither invested in Granite Partners, neither has standing to request a substantial contribution award in that case.

6. The firms, rather than the clients, filed these fee applications. Under the statute, however, the creditor rather than the attorney must file the substantial contribution application. *In re Oxford Homes, Inc.,* 204 B.R. 264, 267 (Bankr. D.Me.1997). In light of the disposition of the application, I will not address this defect.

7. Section 105(a) provides:
 The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed

to preclude the court from, *sua sponte,* taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

8. The Applicants have not billed or collected these sums from their client, and are essentially contingent fee attorneys who hope to recover a court-approved award upon the successful completion of the class action. One party has objected to the current application, arguing that a substantial contribution claimant cannot recover an award if he has not actually paid legal fees and expenses. In light of the disposition of the request, it is unnecessary to consider this issue.

*Energy Co.,* 902 F.2d 1098, 1101 (2d Cir. 1990). Its unlawful activity forced the trustee to seek judicial intervention, and led to increased administrative expenses. Further, a wilful stay violation is punishable as a contempt, and the contemnor is subject to sanctions. *In re Gucci,* 126 F.3d 380, 391–92 (2d Cir.1997); *In re Skinner,* 917 F.2d 444, 448 (10th Cir.1990); *In re Crysen/Montenay Energy Co.,* 902 F.2d at 1104, 3 Lawrence P. King, *et al., Collier* ¶ 362.11[2], at 362–113. Primavera is arguably liable to the estate; but suffice it to say, Primavera did not make a substantial contribution by violating the automatic stay and causing increased administrative expenses. *Cf. In re Best Products Co.,* 173 B.R. at 867 (efforts to obtain control over estate claims which the debtor intended to pursue did not substantially contribute to the chapter 11 case).

### 2. The Disclosure Statement and Plan

■ The applicants assert that they made substantial contributions to the processes leading to the approval of the disclosure statement and the confirmation of the plan. These services accounted for $45,311.25 in billable time. (Primavera App. at 6 n. 11.) The applicants argue that their objections to the proposed disclosure statement led to clarifications concerning the formation of the Unofficial Investors Committee ("UIC") and the interests of its members, the provenance, scope and impact of the Investors' Settlement, the computation of distributions under certain contingencies and the effect of the plan on the Primavera district court class action. The plan objections alerted the Court and the parties to potential internal conflicts in the Litigation Advisory Board (the "LAB") [9] and its attorneys, and led to greater judicial oversight. Further, their unsuccessful objection to the settlement between Kidder and the trustee nevertheless clarified the scope of the release the trustee intended to deliver to Kidder. (Primavera App. at 6–8.)

■ Mere participation in the negotiation, drafting and confirmation of the plan is not sufficient. *In re Baldwin–United Corp.,* 79 B.R. at 340–41. Here, the applicants' objections to the disclosure statement did not alter the character of the document, and did not, therefore, rise to the level of a substantial contribution. *See In re Alert Holdings, Inc.,* 157 B.R. at 759. Additional language incorporated to quell an objector's concerns does not necessarily signify the merit or importance of the objection; it often means the opposite. Rather than argue over insubstantial and relatively unimportant disputes, the proponent simply makes the change, or the court directs it to be made, to move the process along. Further, it is not enough that the objecting party achieve some greater clarity in the document. He must demonstrate an actual or concrete benefit, such as the facilitation of the successful reorganization or added value. Obviously, nothing the applicants said or did achieved these ends.

Further, certain of the applicants' objections involved efforts to improve their own position. The Gold Firm unsuccessfully insisted that the disclosure statement advise investors that they could contact the firm for information about the Primavera litigation. This appeared to be little more than an effort to recruit clients. In addition, its attempt to clarify the effect of the plan on the Primavera litigation was also motivated by self-interest and contributed nothing. None of the parties ever maintained that confirmation would extinguish the investors' personal claims.

### 3. The Claims Objection

■ The applicants billed $21,946.25 to the trustee's claims objection, and contend that they are entitled to a substantial contribution award. The trustee had filed a pleading objecting to all investor claims on the merits, or alternatively, seeking to subordinate the claims under 11 U.S.C. § 510(b). In *Granite II,* I granted the motion to the extent of subordinating the investor claims.

The applicants submitted their fee request before I decided the subordination motion. As with the trustee's adversary proceeding, they argue that their opposition to the trust-

---

9. Under the plan, the LAB succeeded to the estates' causes of action.

ee's motion "substantially contributed to these cases by delineating the law and analysis contrary to the Trustee's position." As noted, I subsequently granted the trustee's motion, rejecting Primavera's arguments. Moreover, the applicants' services were devoted to protecting their clients' claims against the trustee's attacks. In other words, the applicants are seeking a substantial contribution award for unsuccessfully defending a position their clients were not entitled to take under applicable law. I am compelled to conclude that these services did not substantially contribute to the case.

Based on the foregoing, the application made on behalf of Primavera's and Looser's attorneys for a substantial contribution award is denied.

## C. The UIC

The UIC, first organized in December, 1994, consists of a group of thirty-eight shareholders and limited partners in the debtors. The UIC asked the United States Trustee to appoint an unofficial equity committee, but the United States Trustee declined. The UIC never applied to the Court, pursuant to 11 U.S.C. § 1102(a)(2),[10] to compel the appointment of an equity committee.

At the same time that the UIC purported to act as a *de facto* equity committee, it pursued its private interests, often through its participation in these cases. It sued ACM for breach of fiduciary duty and fraud, and Kidder, DLJ and Bear, Stearns for aiding and abetting ACM's breaches of fiduciary duty and fraud. *See ABF Capital Management v. Askin Capital Management, L.P.,* 957 F.Supp. 1308 (S.D.N.Y.1997) (*"ABF Capital"*). The UIC also commenced an adversary proceeding to equitably subordinate Kidder's claims to the claims asserted by the members of the UIC. *See Granite III,* 210

B.R. 508. In all of these matters, it was represented by the Berlack Firm.

The UIC has filed an application on behalf of the Berlack Firm seeking $1,498,497.00 in fees and $188,859.78 in expenses in support of the UIC's substantial contribution claim.[11] The application seeks compensation for all of Berlack's legal services except for two areas: the *ABF Capital* litigation and the equitable subordination action. While I agree that Berlack did an excellent job representing the UIC, and the UIC facilitated the confirmation of the trustee's joint plan, I disagree that Berlack is, therefore, entitled to a substantial contribution award for virtually every service that it performed in these bankruptcy cases.

### 1. The Trustee's Support

■ Before considering Berlack's application, I must consider the weight to accord the trustee's support for the requested award. Prior to the fee hearing, the Court received the *Statement of Harrison J. Goldin, Trustee, in Support of Application of Unofficial Investors' Committee for Reimbursement of Professional Fees and Expenses Pursuant to Bankruptcy Code Section 503(b),* dated May 12, 1997 (*"Goldin Statement"*).[12] Berlack describes this statement as "[c]orroborating testimony by a disinterested party." (*Reply to Objections to the Unofficial Investors' Committee's Application for the Reimbursement of Professional Fees and Expenses,* dated May 12, 1997, at ¶ 1 n. 2.)

As the title indicates, the *Goldin Statement* supports the Berlack application, but in the main, lacks specificity. For example, it describes the UIC's (and hence, Berlack's) role as a "counterweight," (*id.* at ¶¶ 13, 14) and an "aggressive gadfly," (*id.* at ¶ 15), but provides few examples of concrete benefits. Aside from the UIC's contributions to the

---

**10.** Section 1102(a)(2) of the Bankruptcy Code provides:

On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee.

**11.** In response to certain objections, the Berlack Firm agreed to reduce its fee request by $33,274.50.

**12.** The *Goldin Statement* is unsworn. In a subsequent affidavit, sworn to May 22, 1997, the trustee incorporated his unsworn statement by reference.

plan, disclosure statement and related settlements, (see id. at ¶¶ 10, 17), discussed below, the trustee points only to the UIC's support for his efforts to obtain discovery from the brokers, (id. at ¶ 13), and its help in identifying "several additional bonds on which I subsequently asserted claims of several million dollars." (Id. at ¶ 16.) The trustee also describes the UIC's role as an unofficial committee that built consensus and compromise within its own disparate ranks, (see id. at ¶ 9), but he does not indicate the basis for his knowledge regarding the internal workings of the committee.

I must view the trustee's statement in the light of the circumstances that induced him to tender it. In negotiating the plan, the trustee and the UIC struck a bargain: at first, the trustee undertook to support the UIC's "reasonably documented" substantial contribution application, and the UIC agreed to support the "reasonably documented" applications submitted by the trustee and his professionals. *Disclosure Statement for the Trustee's Joint Plan of Liquidation for the Debtors,* dated Dec. 18, 1996, at 48–49. This proposed pledge met with criticism. It seemed that the trustee was promising to support an application, sight unseen and without regard to whether the UIC had made a substantial contribution, in violation of his fiduciary duty. *See In re United States Lines, Inc.,* 103 B.R. at 431 n. 1.

In response, the trustee and the UIC modified their agreement. In an amendment to the disclosure statement, the trustee stated that he had determined that the UIC had made a substantial contribution, and agreed to support a "reasonably documented" application, "but only for work done by the Unofficial Investors' Committee that satisfies the requirements of such provision." *Disclosure Statement for the Trustee's Third Amended Joint Plan of Liquidation for the Debtors,* dated Jan. 27, 1997, at 54.

Berlack got what it bargained for. It received the trustee's endorsement with few specific concessions regarding actual and demonstrable benefits conferred on the estates.

No other fee applicant procured a similar promise from the trustee, and consequently, the trustee deemed it inappropriate to comment on any of the several other substantial contribution applications. (*Goldin Statement* at ¶ 3.) I therefore accord the trustee's support little weight.

▮ In any event, I must independently examine the fees and expenses, and determine their reasonableness. *In re Oxford Homes, Inc.,* 204 B.R. at 268–69; *see In re Texaco, Inc.,* 90 B.R. at 630. I feel suited to the task. I presided over these cases for three years, and before the UIC and Berlack ever became involved. During this period, I have had many opportunities to observe Berlack's services, and feel qualified to judge the merits of the application.

### 2. The Scope of Berlack's Substantial Contribution

▮ With the possible exception of DLJ, everyone involved in these bankruptcies agrees that the UIC made a substantial contribution. The Berlack Firm lent its expertise to the goal of resolving many obstacles to confirmation, and thereby facilitated the successful liquidation of the three debtors. Working with the trustee, the Berlack Firm's efforts led to the Investor Settlement which paved the way for confirmation and established the postconfirmation administration of the estates and control over the various claims asserted by the debtors against certain brokers. In connection with the confirmation process, the Berlack Firm and the trustee worked jointly on the disclosure statement which I approved, and also facilitated settlements between the trustee and John Polk, Lionel Sterling, the Whitehead entities and Whitehead Institute for Biomedical Research.

Given this undisputed substantial contribution, the Berlack Firm reasons that it is entitled to an award for all of the services it rendered except for the *ABF Capital* and equitable subordination lawsuits that it admits were solely for the benefit of its clients.[13] The Berlack Firm states its

---

**13.** Berlack also implies that the UIC should be rewarded for investing its time and money par-

ticipating in these cases. Its application states that given the financial condition of the estates,

**452**

premise forthrightly in the following manner: because the UIC concededly rendered a substantial contribution toward plan confirmation, "each of the services provided by the UIC's professionals that pre-dated the development and prosecution of the Plan are compensable." *Supplemental Affidavit of Edward S. Weisfelner in Further Support of Application Pursuant to Bankruptcy Code Sections 503(b)(3)(D), 503(b)(4), and 105(a) and Bankruptcy Rule 2016(a) for the Reimbursement of Professional Fees and Expenses Incurred by the Unofficial Investors' Committee*, sworn to May 28, 1997, at ¶ 8 ("*Weisfelner Supp. Aff.*") [14]

Berlack's argument founders on a fallacy of logic. It maintains that because the UIC—through Berlack—made a substantial contribution to confirmation, it follows that all of Berlack's services preceding confirmation substantially contributed to the cases. The fallacy of logic—*post hoc, ergo propter hoc*—reasons from sequence to consequence, assuming a causal connection simply because one event follows another. *See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 116–17 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). This, however, is speculation not proof. *Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 521 n. 8 (10th Cir.1987).[15] Furthermore, Berlack's application includes services that are patently not compensable. Examples are discussed below.

### 3. Berlack's Nonbeneficial Services

 It has been difficult to categorize or identify Berlack's specific services. Consistent with its "all or nothing" approach, Berlack's application divides its time into two billing categories, but includes most of its time in one category. This category, denominated "Chapter 11 Cases," consists of 185 pages of billing records accounting for $1,276,520.50 in billable time.[16]

It would require a herculean task on my part to segregate the compensable from noncompensable services, assuming that I could even do so based simply upon the descriptions in the time records. I should not be obliged to pick apart the fee application to explain which services are not compensable; the Berlack Firm is required to prove, by a preponderance of the evidence, which services are. Accordingly, the following discussion does not provide an exhaustive list of noncompensable services, but nevertheless highlights the problem with Berlack's approach to this matter.

#### a. Disputes with the trustee

The UIC frequently found fault with the direction and pace of these cases, and until the end, was antagonistic to the trustee. The trustee often followed a conciliatory route, trying to reach consensual resolutions to various disputes with broker-creditors. The UIC, on the other hand, lobbied for a bolder and more aggressive approach. For example, at a time when the trustee was

---

the "UIC undertook considerable risks in becoming involved in these cases and in remaining involved for the better part of 28 months." (*Weisfelner Supp. Aff.* at ¶ 4.) The UIC undertook considerable risks when its members invested $230 million in the debtors; it assumed a minimal risk when it hired the Berlack Firm and paid it approximately $1.5 million to try to get some of it back.

**14.** At another point, Berlack declares: "[s]tated simply, the Plan would not exist had the UIC not engaged in each of its prior activities." (*Weisfelner Supp. Aff.* at ¶ 15) (footnote omitted.)

**15.** The authorities on which Berlack relies do not support its argument that it is entitled to all of its preconfirmation expenses. Berlack cites *A.M. Int'l, Inc.*, 203 B.R. 898, but there the court did not discuss any of the specific fees or expenses at issue. Berlack also cites *In re Richton Int'l Corp.* 15 B.R. 854, but there the applicant excluded the

fees for services rendered directly to its client, *id.* at 856, and the court did not discuss the specific fees that formed the basis of the award.

**16.** The absence of project billing ignores the 1991 Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases. Under section B.4 of the Guidelines, the professional must separate the time billed to a discrete activity which can reasonably be expected to last more than three months and account for approximately 10% to 20% or more of the fees sought for an interim period. In practice, attorneys involved in large cases like these establish separate billing categories for discrete activities without regard to the anticipated time that will be spent. The categorization of services in this matter facilitates review of the fee application.

negotiating with DLJ and Kidder, and had actually reached a settlement with Kidder, the UIC attempted to prosecute objections to their claims. After the trustee commenced a lawsuit, asserting estate claims against Bear, Stearns, the UIC sought to intervene. Most significantly, the UIC also filed a motion in which it sought, without success, to remove the trustee.[17]

Finally, the UIC attempted to assert estate claims in collateral litigation in violation of the automatic stay. In the *ABF Capital* action pending in district court, the UIC alleged and Judge Sweet ultimately dismissed two claims that, the district court concluded, only the trustee could bring: damages based on ACM's breach of its fiduciary duties to the debtors, *ABF Capital*, 957 F.Supp. at 1331–32, and unjust enrichment based on the debtors' payment of fees and charges to all defendants and the brokers' receipt of the proceeds of the liquidation sales. *Id.* at 1333–34. Thereafter, the UIC moved for reargument, *inter alia*, on its breach of fiduciary duty claim, but its motion was denied. *ABF Capital Management v. Askin Capital Management*, No. 96 Civ. 2978, 1997 WL 317365, at * 3–4 (S.D.N.Y. 1997). As with Primavera, the assertion of estate claims violated the automatic stay.

The UIC's efforts to wrest control over claims that the trustee was administering did not contribute substantially to these cases. *See In re Best Products Co.*, 173 B.R. at 867. Rather, they increased administrative expenses. Accordingly, they do not entitle the UIC to a substantial contribution award.

### b. Client-related services

Berlack's application seeks an award based upon services it rendered solely to its clients for their exclusive benefit. Obvious examples include a motion to extend the bar date

for its clients only, helping the UIC members prepare and file their proofs of claim, recruiting clients and preparing Rule 2019 statements, billing clients, communicating with clients and responding to requests sent by their clients' auditors.

In addition, Berlack seeks to charge the estate for the fees it incurred opposing the trustee's motion to expunge or subordinate the investors' claims. As noted earlier, I granted the alternative relief, and subordinated the claims under 11 U.S.C. § 510(b). *Granite II*, 208 B.R. 332. In opposing the objection, the Berlack Firm rendered services solely on behalf of its clients, defending a litigation brought against them by the trustee. One who unsuccessfully litigates with the trustee on behalf of his clients is hard-pressed to show a substantial contribution. Here, the UIC lost on this issue, and its efforts did not lead to any actual or demonstrable benefit.

Berlack's application also includes substantial time devoted to monitoring and participating in the case. During the case, the UIC took an active role in attempting to influence the scope and execution of the trustee's investigation, while simultaneously conducting its own. Often critical of the trustee's efforts, the UIC spent substantial time ferreting out claims which the trustee supposedly missed or ignored.[18] In particular, the UIC conducted Rule 2004 exams, commented on the trustee's reports and met with the trustee to assist his factual investigation and identify claims.

The creditor, even one who makes a substantial contribution, cannot recover for the services his attorney devoted to case administration, monitoring and education; such services are deemed to be performed for the client. *See In re 9085 E. Mineral Office Bldg., Ltd.*, 119 B.R. at 254 and n. 21;

---

17. The UIC points out that although I denied the removal motion, I granted its alternative request to compel immediate consideration of the Kidder settlement which the trustee had reached but did not intend to submit for approval until confirmation. Subsequently, the UIC agreed that consideration of the Kidder settlement should be deferred until confirmation, and it was. Consequently, any benefit that the UIC claims it obtained it immediately surrendered.

18. The trustee states that he and his professionals pursued the factual and legal theories independent of the UIC's urging. *Goldin Statement* ¶ 14. In any event, the UIC must demonstrate a direct and substantial benefit from its investigative input. Although it hypothesizes and boasts about the value of its assistance, the true value, if any, is simply a matter of speculation.

*In re Texaco, Inc.,* 90 B.R. at 631. Here, Berlack attended hearings, conducted discovery, reviewed papers and communicated with its clients. Notwithstanding its substantial contribution to the cases, the UIC must alone bear these costs.

In fact, the UIC said it would when it asked me to permit Berlack to conduct discovery. After the UIC became actively involved, and while the trustee was conducting his investigation, the UIC sought authority to conduct its own examinations pursuant to Federal Bankruptcy Rule 2004. Its request met with opposition. In addition, I expressed concern that since the trustee was already conducting an investigation, the Berlack Firm's own investigation would be unnecessarily duplicative. To quell these concerns, Edward S. Weisfelner, Esq., the UIC's counsel, assured me that the estates would not bear any of the costs of a parallel investigation:

> Under certain circumstances Your Honor may be right. I will tell you what they are because they don't apply here.

> If I were counsel to an official committee and I were submitting to Your Honor invoices for payments of my fees out of this Debtor's estate, you might have a point.

> We are funding this investigation ourselves.

(Transcript of hearing, held September 28, 1995, at 21.)

Weisfelner repeated this argument a few moments later:

> I suggest circumstances ought to dispel that allusion. We are going to pay for this, the estate is not bearing the expenses, that ought to be a compelling issue. I mean, think about it.

(*Id.* at 39.)

This argument convinced me to authorize the parallel investigation. Moreover, as it turns out, the UIC had good reason to conduct its own investigation: it intended to sue the brokers and ACM. Yet it now seeks an award of nearly $60,000.00 in fees and expenses for conducting an investigation it said it would not charge to the estates. In addition, it rendered these services on behalf of its clients and used the information to sue ACM and the brokers, sometimes usurping the estates' claims in the process. Any benefit to the estates is conjectural, and the UIC is not entitled to a substantial contribution award for duplicating the trustee's investigation.

### c. Noncompensable services

▇▇ Berlack seeks to recover $136,890.00 that it paid to Barry M. Levine for professional services rendered as the UIC's expert on capital markets and CMOs. By its terms, however, section 503(b)(4) applies only to attorneys and accountants. Financial advisors, such as Levine, cannot be compensated on a substantial contribution basis. *In re Baldwin–United Corp.,* 79 B.R. at 341; *see In re Keene Corp.,* 208 B.R. 112, 116 n. 8 (Bankr. S.D.N.Y.1997) (*dicta* ); *but cf. In re AM Int'l Inc.,* 203 B.R. 898 (D.Del.1996) (awarding substantial contribution to financial advisor without discussing scope of section 503(b)(4)). The UIC cannot circumvent the plain limitation in section 503(b)(4) by recovering the financial advisor's fees as a reimbursable expense under section 503(b)(3)(E).

### d. Other services

Some of the services that Berlack rendered neither hindered nor advanced the cases. For example, Berlack seeks an award based upon its participation in the proceedings relating to the trustee's lawsuit against Primavera. The UIC was not even a party to that lawsuit, and Berlack's services duplicated those of the trustee.

▇▇ The Berlack Firm also seeks fees for preparing and prosecuting its fee application. Some cases have included these services as part of the substantial contribution award. They reason that the substantial contribution attorney must apply for fees in the same manner as the court-approved attorney, and nothing justifies treating the two differently. *In re 9085 E. Mineral Office Bldg., Ltd.,* 119 B.R. at 255; *In re Hers Cosmetics Corp.,* 114 B.R. 240, 243–44 (Bankr.C.D.Cal.1990). The only court in this district to consider this issue disagreed, concluding that the fee application confers no benefit on the estate. *In re United States Lines, Inc.,* 103 B.R. at 432.

I agree with *United States Lines* because there are valid reasons to differentiate between fee applications under sections 330 and 503(b). Initially, courts have split over whether an attorney retained pursuant to court order can recover fees, under section 330, for the time spent preparing the fee application. *See generally* 2 James F. Queenan, Jr., *et al., Chapter 11 Theory & Practice: A Guide to Reorganization* § 12.20, at 12:50–12:52 (1994); James B. Hirsch, Note, *Bankruptcy Fee Applications: Compensable Service or Cost of Doing Business*, 58 Fordham L.Rev. 1327, 1328–29 (1990). The courts that award fees justify their awards by noting that counsel must prepare detailed, time consuming applications. *In re Nucorp Energy, Inc.*, 764 F.2d 655, 662 (9th Cir.1985); *In re S.T.N. Enters., Inc.*, 70 B.R. 823, 835 (Bankr.D.Vt.1987). Unless they do, they cannot get paid. Accordingly, the preparation of the fee application is a reasonable and necessary expense under section 330.

This reasoning does not extend to substantial contribution applications. The creditor's attorney does not have to keep meticulous records or apply to the court for any compensation in order to get paid. He looks, instead, to his client. If the creditor wants to shift the fee burden to the estate through a substantial contribution application, the creditor benefits but the estate does not. This is particularly true where, as here, the applicant spills so much ink preparing an application with so little merit. Accordingly, the time spent by the Berlack Firm preparing their fee application did not confer a substantial benefit in the case, and must be borne by its clients.

### CONCLUSION

Based on the foregoing, I conclude that Berlack is entitled to a substantial contribution award for the services it rendered in connection with its work on the disclosure statement, the plan and the related settlements discussed above. In light of the *Goldin Statement*, Berlack may also be entitled to an award to the extent that its review of the Kidder liquidations led the trustee to discover additional bonds and assert corresponding claims. Berlack must first identify its services, and explain how and to what extent the assertion of these claims led to a reduction in Kidder's allowable claims under its settlement with the trustee. In all other respects, its application is denied. Berlack Firm may submit a revised application which presents the time records that correspond to those services and expenses that are allowable on a substantial contribution basis as outlined above.