**In re WORLDWIDE DIRECT, INC., et al., Debtors.**

**No. 99–108(MFW), 99–127(MFW).**

United States Bankruptcy Court, D. Delaware.

Nov. 30, 2005.

**118**

Adam G. Landis, Landis, Rath & Cobb, Wilmington, DE, for Wilmington Trust Company.

Tonny Ho, Willkie, Farr & Gallagher, LLP, New York City, for Wilmington Trust Company.

Francis A. Monaco, Jr., Monzack & Monaco, Wilmington, DE, for Resurgence Asset Management, L.L.C.

## OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court are the Applications of Wilmington Trust Company ("WTC") as Indenture Trustee filed on August 14, 2001, and August 15, 2005, for allowance of an administrative expense claim and a charging lien for its remaining unsecured claim for services rendered by it and its attorneys in this case and for a period after confirmation. Goldin Associates, L.L.C. (the "Liquidating Trustee") and Resurgence Asset Management L.L.C., ("Resurgence") object to those Applications. For the reasons stated below, the Court will grant, in part, WTC's request for an administrative claim and will allow in a reduced amount its requested unsecured claim with a charging lien.

### I. BACKGROUND

On January 19, 1999, Worldwide Direct, Inc., SmarTalk TeleServices, Inc., and several affiliates (collectively "the Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code. Immediately prior to the filing, the Debtors had executed an asset purchase agreement with AT & T for the sale of substantially all the Debtors' assets. Pursuant to auction procedures approved by Order dated February 26, 1999, the Debtors' asset sale was advertised and prospective alternative bidders were contacted, but ultimately no other bidder submitted an alternative offer for the Debtors' assets and business. By Order dated March 18, 1999, the Court approved the sale to AT & T.

The Official Unsecured Creditors' Committee (the "Committee") was appointed on February 2, 1999. The Committee retained Munsch, Hardt, Kopf & Harr as counsel.

WTC is the Indenture Trustee for the Noteholders under an indenture dated September 17, 1997, with SmarTalk TeleServices, Inc. (the "Indenture"). The Noteholders' claims total $153,022,213.39 and represent over 50% of the general unsecured claims against the Debtors. WTC was appointed to the Committee and was asked to serve as Committee co-chair.

On April 27, 2000, the Debtors and the Committee filed the Second Amended Joint Consolidated Liquidating Plan of Reorganization (the "Plan") which was confirmed on June 7, 2001, and took effect on June 30, 2001. Under the Plan, the Noteholders and all other unsecured creditors of the Debtors (with a limited exception) are included within the same class. The Liquidating Trustee was appointed to liq-

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

uidate the Debtors' remaining assets, to review claims, and to make distributions to creditors.

On August 14, 2001, WTC filed an Application seeking allowance of $1,123,758.81 as an administrative claim and $411,083.50 (plus any amount not allowed as an administrative claim) as an unsecured claim with a charging lien against distributions due to the Noteholders. The majority of WTC's claim represents the expenses of its attorneys, Wilkie Farr & Gallagher ("WF & G") and Klett Rooney Lieber & Schorling, P.C. ("KRL & S").

On December 7, 2001, Resurgence [2] filed an objection to WTC's Application. On February 15, 2002, WTC filed an Amended Application and response to the Resurgence objection. In its Amended Application, WTC reduced its administrative claim request by $14,521 to $1,109,237.81. On March 29, 2002, the Liquidating Trustee and Resurgence filed a response to the Amended Application. On April 8, 2002, WTC filed its reply. A hearing was held on WTC's Amended Application on October 25, 2002, at which the parties presented affidavits and testimony in support of their positions.

On August 15, 2005, WTC filed an Application seeking allowance of an additional unsecured claim of $99,055.54 for attorneys' fees for the period between July 1, 2001, and September 26, 2002, with a charging lien against the Noteholders' distribution. Resurgence filed an objection to that Application as well. The parties

presented testimony and argument at a hearing held on October 18, 2005. These matters have been fully briefed and are ripe for decision.

## II. *JURISDICTION*

This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A), (B), & (O).

## III. *DISCUSSION*

### A. *Failure to Comply with Local Rule 2016–2*

In its initial objection, Resurgence maintains that neither WTC nor its attorneys complied with Local Rule 2016–2.[3] Specifically, Resurgence asserts that the time records of WTC's counsel did not provide detailed descriptions or categories of the services rendered. Therefore, Resurgence contends that the Court should summarily dismiss the Applications.

In its Amended Application WTC states that, because it was not a retained professional in the bankruptcy case, its "claim [based on the Indenture] would not normally involve the specificity required of fee applications under 11 U.S.C. section 330." WTC acknowledges, though, that it must provide "meticulous contemporaneous time records ... [which] should reveal sufficient data to enable the Court to make an informed judgment about the specific tasks and hours allotted." *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 582 (Bankr. D.Utah 1985). Accordingly, WTC and its

---

**2.** Resurgence is the holder of approximately $120 million of the $153 million in notes. It purchased most, if not all, of those notes postpetition.

**3.** Local Rule 2016–2 states the information required in a request for approval of compensation and/or reimbursement of expenses. Subsection (d) requires that fee applications include: (i) project categories; (ii) complete

and detailed activity descriptions presented chronologically; (iii) time allotments; (iv) in increments of one-tenths of an hour; (v) the type of activity; (vi) the subject matter; (vii) no lumping; (viii) travel time billed at no more than 50% of regular hourly rates; (ix) the participants, their roles and the subject of all meetings and hearings. Del. Bankr.L.R. 2016–2(d).

attorneys reviewed the time records submitted with the original Application and, in its Amended Application, categorized the time based on the various issues raised in the case.[4] In its supplemental objection, Resurgence asserts that this is still insufficient.

■ Although WTC may be correct that less detail is needed in its time records under the Indenture, a request for an administrative claim under section 503(b) requires the same level of documentation and substantiation as a request for compensation under section 330. Del. Bankr. L.R. 2016–2(a)(ii). *See also In re Granite Partners, L.P.*, 213 B.R. 440, 447 (Bankr. S.D.N.Y.1997).

■ The Court will not summarily dismiss the Applications because they do contain some detail. The Court will consider the time records as submitted, but "should not be obliged to pick apart the fee application to explain which services are not compensable; the [applicant] is required to prove, by a preponderance of the evidence, which services are." *Granite Partners*, 213 B.R. at 452. *See also In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 845–46 (3d Cir.1994) (holding that bankruptcy court need not become enmeshed in a meticulous analysis of every detailed facet of the professional representation, but need only correct reasonably discernible abuses after affording fee applicants a hearing to respond to objections to their fees).

### B. *Administrative Claim*

WTC seeks an administrative claim under section 503(b)(3)(D), contending it made a substantial contribution in this case. Alternatively, WTC relies on section

503(b)(3)(F), which allows expenses of Committee members. Finally, WTC argues that, because it is entitled to an administrative claim under section 503(b)(3)(D) or (F), it is entitled to an administrative claim for its attorneys' fees under section 503(b)(4).

■ WTC must prove that it is entitled to an administrative expense award by a preponderance of the evidence. *See, e.g., Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir.1999) (holding that the burden of proof is on the claimant); *In re TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir.1992) (holding that "the burden of persuasion, by a preponderance of the evidence, remains with the movant").

### 1. *Section 503(b)(4)*

The bulk of WTC's administrative claim represents the fees and expenses of its attorneys, WF & G and KRL & S. WTC asserts they are allowable pursuant to section 503(b)(4), which allows as an administrative claim:

> reasonable compensation for professional services rendered by an attorney . . . of an entity whose expense is allowable under . . . paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney. . . .

11 U.S.C. § 503(b)(4).[5]

■ Thus, allowance of attorneys' fees under section 503(b)(4) is predicated on a

---

**4.** Those categories are: Creditors' Committee/General; AT & T Sale; Financing; Litigation; Fletcher; Claims; Plan/Disclosure Statement; Noteholders; and Senior Debt.

**5.** Section 503(b)(4) was amended effective October 17, 2005. The prior version (which is applicable to this case) allowed attorneys' fees if the creditor had a claim under any subsection of section 503(b)(3). *See, e.g., In re*

finding that WTC has a claim under section 503(b)(3)(D) or 503(b)(3)(F). *See, e.g., In re Morad,* 328 B.R. 264, 269 (1st Cir. BAP 2005) (holding that legal fees under section 503(b)(4) are allowable only if creditor can demonstrate a qualifying occurrence under section 503(b)(3)). Therefore, the Court will address the services rendered by WTC and its counsel together to determine if the requirements of those sections have been met.

### 2. *Section 503(b)(3)(D)*

Section 503(b)(3)(D) allows an administrative claim to:

> a creditor [or] an indenture trustee ... in making a substantial contribution in a case under chapter ... 11 of this title. ...

11 U.S.C. § 503(b)(3)(D).

As the Indenture Trustee, WTC falls within the scope of section 503(b)(3)(D). Normally, however, the activities of an indenture trustee are focused on benefitting its constituents rather than all creditors.

> [U]nlike the trustee, the debtor-in-possession and the official creditors' committee, which are entities with fiduciary obligations to the bankruptcy estate, an indenture trustee owes its fiduciary duty to the debenture holders, not the bankruptcy estate. The indenture trustee acts in the best interest of its debenture holders. In order to satisfy its fiduciary duty to its debenture holders, the indenture trustee may take actions that are of only marginal or incidental benefit to the bankruptcy estate. The bankruptcy estate should not have to pay for services which primarily benefit the debenture holders and only incidentally benefit the bankruptcy estate.

*First Merchs. Acceptance Corp.,* 198 F.3d 394, 399 (3d Cir.1999). The new version does not

*In re Flight Transp. Corp. Sec. Litig.,* 874 F.2d 576, 581 (8th Cir.1989).

WTC contends nonetheless that it made a substantial contribution to the estate and, therefore, it should be awarded an administrative expense under section 503(b)(3)(D) for its time and, under section 503(b)(4), for its attorneys' time.

██ A claimant makes a substantial contribution if its efforts result in an "actual and demonstrable benefit to the debtor's estate and the creditors." *In re Lebron,* 27 F.3d 937, 944 (3d Cir.1994), *quoting In re Lister,* 846 F.2d 55, 57 (10th Cir.1988). *See also In re Essential Therapeutics, Inc.,* 308 B.R. 170 (Bankr.D.Del.2004). This Court in *Essential Therapeutics* explained:

> Section 503(b)(3)(D) reconciles two conflicting objectives of encouraging participation in the reorganization process and preserving the value of the estate for creditors. Inherent in substantial contribution, however, is the requirement that the benefit received by the estate be more than incidental to the applicant's self-interest. Creditors are presumed to be self-interested unless they establish that their actions are designed to benefit others who would foreseeably be interested in the estate. Reimbursement is improper where the activities of the interested parties are designed to serve primarily their own interests and would have been undertaken without an expectation of reimbursement from the estate.

*Id.* at 174 (internal citations omitted).

██ "The substantial contribution test is applied in hindsight, and scrutinizes the actual benefit to the case. Accordingly, the applicant must show a 'causal connection' between the service and the con-

allow attorneys' fees if the creditor's claim arises under section 503(b)(3)(F).

tribution." *Granite Partners*, 213 B.R. at 447 (citation omitted).

■ "In determining whether a creditor has met [its] burden, courts consider the following factors: 1) whether the services were rendered solely to benefit the client or to benefit all parties in the case; 2) whether the services provided direct, significant and demonstrable benefit to the estate; and, 3) whether the services were duplicative of services rendered by attorneys for the committee, the committees themselves, or the debtor and its attorneys." *In re Buckhead Am. Corp.*, 161 B.R. 11, 15 (Bankr.D.Del.1993) (citation omitted). "Compensation based on substantial contribution is designed to promote meaningful participation in the reorganization process, but at the same time, discourage mushrooming administrative expenses.... Accordingly, the substantial contribution provisions must be narrowly construed." *Granite Partners*, 213 B.R. at 445 (internal citations omitted). *Accord Flight Transp.*, 874 F.2d at 581.

In support of its claim, WTC submitted affidavits and deposition testimony of Tonny Ho, David C. Roulston and James McGinley, together with their time records. Ho is the partner at WF & G who was principally responsible for the engagement. Roulston is a Vice President and Counsel in the Legal Department at WTC; McGinley is Vice President and Regional Sales Manager at WTC. An affidavit and time records of Adam Landis,

formerly of KRL & S, were also submitted. In the affidavits and depositions, WTC's representatives asserted that their efforts benefitted the estate by assisting the Committee in assuring the AT & T sale procedures were fair, in formulating the Plan, in evaluating claims (particularly claims that asserted seniority over the Noteholders' claims), and in evaluating litigation the estate had against former officers and advisors.

The Liquidating Trustee objects to WTC's request for an administrative claim, asserting that WTC has not overcome the presumption that it was acting primarily in its own self-interest or demonstrated it made a substantial contribution. *See, e.g., Lebron*, 27 F.3d at 944.[6]

Resurgence objects, in part, to WTC's substantial contribution claim. Resurgence acknowledges, however, that $206,697 of WTC's claim should be allowed as an administrative claim. Resurgence concedes that a portion of the time spent by WTC's counsel in working on the Fletcher litigation ($57,593) and drafting the plan and disclosure statement ($97,665) is compensable because that represents work that the Committee specifically asked WTC to do and, therefore, represents a substantial contribution to the case.[7] Finally, Resurgence is willing to allow $51,439 for work performed by WTC on the Committee because that is the amount that was awarded (without objection) to another Committee member, Global Cross-

---

**6.** To the extent the Court is inclined to allow any administrative expense to WTC, the Liquidating Trustee asserts that it should be reduced by at least $255,107.95 because of lack of detail, duplication, travel and secretarial time, and math errors. In its Amended Application, WTC conceded $14,521 because of duplication and math errors, but disputed the remainder. Because the Court concludes that only a portion of WTC's claim can be allowed as an administrative claim, it is unnecessary to get into the details of the Liquidating Trustee's objection.

**7.** In calculating these amounts, Resurgence first deducts the time spent in these categories that was solely for the benefit of the Noteholders. Resurgence takes 50% of the remainder of the time and multiplies it by the hourly rate of the associate at WF & G who worked on the file.

ing Bandwidth, Inc., as an administrative expense.

The Court has reviewed the affidavits, time records, depositions, and various pleadings submitted by the parties to determine whether the services provided by WTC and its counsel conferred an actual and demonstrable benefit upon the estate and the creditors by fostering or enhancing the progress of the reorganization. *See Lebron*, 27 F.3d at 944. Because WTC is presumed to be acting in the interests of the Noteholders, it must introduce "something more than 'self-serving statements regarding [its] involvement in [the] case' " in order to carry its burden of demonstrating that its services provided a substantial contribution to the estate. *Buckhead*, 161 B.R. at 15 (citation omitted).

Because Resurgence, the largest unsecured creditor in this case, concedes that some of the work performed by WTC and its counsel did benefit the estate generally, WTC has some support by a disinterested party for its request. "Corroborating testimony by a *disinterested* party attesting to a claimant's instrumental acts has proven to be a decisive factor in awarding compensation to activities which otherwise might not constitute a 'substantial contribution'." *Id.* (citation omitted).

### a. *Plan and Disclosure Statement*

 WTC contends that the services performed in the Plan/Disclosure Statement category provided a benefit to all creditors and the estates. Although Roulston spent approximately 129.1 hours in this category, he testified that those services were rendered principally by WF & G. Ho testified that he was asked to serve on the Plan working group with counsel for the Committee and counsel for the Debtors. Because there were issues of classification and distribution that affected the treatment of the Noteholders, the Committee felt that those provisions should be drafted by WTC.

 Resurgence acknowledges that WTC did make a substantial contribution to the estate in this category as evidenced by the Committee's request for WTC's assistance. The Court agrees. In the absence of Ho's involvement, counsel for the Committee or the Debtors would have had to do that work, at the expense of the estate. The amount requested by WTC in this category ($332,294), however, clearly represents more than just work for the benefit of all creditors. Ho could not identify any specific provision of the Plan that he drafted that benefitted the entire creditor body (acknowledging that Committee counsel was the principal draftsman of the document). Ho testified that he participated in many discussions and revisions of the Plan. To the extent that WTC and its counsel reviewed the Plan and Disclosure Statement to protect the interests of the Noteholders, that did not provide any substantial benefit to the estate. "Extensive participation alone is insufficient to justify an award." *Granite Partners*, 213 B.R. at 445.

Further, the Plan in this case was not that complicated. The Debtors sold all their assets early in the case and a liquidating plan was inevitable. Therefore, the Court will allow WTC's request for an administrative expense under section 503(b)(3)(D) and 503(b)(4) for services provided in this category only in the amount of $97,665 which is conceded by Resurgence to represent the value of the work performed by WTC's counsel at the request of the Committee.

### b. *Fletcher Litigation*

 Resurgence also concedes that part of the work done by WTC in connection with the Fletcher adversary was done at the behest of the Committee and, therefore, made a substantial contribution to the

estate. Resurgence calculates that $57,593 is the amount that should be allowed as an administrative claim for this category.

WTC has provided no evidence to support any request for more than that amount. In this regard, Roulston acknowledges in paragraphs 21 and 22 of his affidavit that the Noteholders' interests were not completely aligned with the Debtors' or the Committee's interests in the Fletcher litigation, thereby necessitating the filing of a separate brief in opposition. Roulston further noted that the settlement with Fletcher "inured directly and materially to the benefit of the Noteholders."

The Court concludes that the services performed by WTC and its attorneys in this category that provided a benefit only for the Noteholders are not compensable as an administrative claim. To the extent WTC performed services at the request of the Committee, however, WTC did make a substantial contribution to the case. Fees in the amount of $57,593 for this category will be allowed as an administrative claim under section 503(b)(3)(D) and 503(b)(4).

c. *Committee/General*

 WTC incurred the bulk of its fees in the Committee/General category. Routine activities of a Committee member do not rise to the level of a substantial contribution. *See, e.g., In re Columbia Gas Sys., Inc.*, 224 B.R. 540, 548 (Bankr. D.Del.1998) (holding that expected or routine activities in a Chapter 11 case do not constitute substantial contribution); *Granite Partners*, 213 B.R. at 445 (holding that extensive participation, without a showing that the activities increased the size of the estate, cannot establish substantial contribution) (citations omitted).

WTC has failed to demonstrate any "causal connection" between its efforts and a benefit to the creditors or the reorganization process in general. Rather, it appears from the testimony and the time records that WTC was simply fulfilling its fiduciary duties as a Committee member and performing the routine Committee tasks delineated in section 1103(c).[8] WTC provides no evidence that it was instrumental in providing any tangible benefit to the creditors, the Debtors or the estate beyond what is expected from a Committee member. The Court concludes that none of WTC's fees in this category are allowable as a substantial contribution claim under section 503(b)(3)(D).

d. *Remaining Categories*

 Resurgence argues that none of the other categories of services represent work done at the request of the Committee or work that provided any tangible benefit to the estate. The Court agrees with Resurgence that it is difficult to ascertain from WTC's Applications what other services provided a substantial contribution to the estate. *See, e.g., In re Psychiatric Hosps. of Hernando County, Inc.*, 228 B.R. 764, 767 (Bankr.M.D.Fla.1998) ("Administrative expense compensation based on a substantial benefit to a bankruptcy estate must be strictly limited to extraordinary creditor actions that lead directly to tangible benefits to the creditors, the debtor or the estate. Compensation may be awarded only in those rare occasions when a creditor's involvement in the case truly fostered and enhanced the administration of the estate.") (citation omitted).

Resurgence contends that the actions of WTC and its attorneys on Noteholder, Senior Debt and Claims matters were tak-

---

**8.** As a member of the Committee, WTC was bound to act in a fiduciary capacity for all creditors. *See Woods v. City Nat'l Bank &* *Trust Co.*, 312 U.S. 262, 268, 61 S.Ct. 493, 85 L.Ed. 820 (1941).

en solely for the benefit of the Noteholders, not for creditors or the estate generally. Roulston's testimony confirms this because he stated that the services "were rendered predominantly, if not solely, for the benefit of the Noteholders." In each of those categories, WTC and its attorneys were concerned first and foremost with assuring that the Noteholders' interests were protected vis-a-vis other creditors. Such activities were performed for WTC's own self-interest and did not provide a substantial, demonstrable benefit to the estate.

In the AT & T Sale/Financing category, WTC asserts that it "played an integral role in connection with the successful outcome of the AT & T Sale." According to Roulston, WTC objected to the sale because of concerns about the bidding process and certain provisions contained in the AT & T sale and financing documents. Roulston testified that WTC and its counsel were actively involved in discussions and negotiations with counsel and representatives for AT & T and the Debtors to resolve those objections. Ultimately, the objections were resolved in a manner that WTC asserts improved the sale process and the AT & T transaction for the benefit of all creditors of the estate.

Resurgence argues that WTC's efforts with respect to the AT & T sale were largely duplicative of the Committee's counsel, which has charged over $5 million in these cases. Although the Debtors received $96 million in cash plus other consideration (including a $40 million holdback note) from the sale, there is no evidence what amount was due solely (or even primarily) to WTC's efforts. In fact, WTC acknowledges that it was one of many parties participating in the negotiations with AT & T. *See, e.g., In re Alumni Hotel Corp.*, 203 B.R. 624, 632 (Bankr. E.D.Mich.1996) (holding that "encouraging negotiation and proposing agreeable terms is a routine task, and often the professional obligation, of a creditor's counsel."). Because the Court finds no evidence that WTC's individual efforts conveyed any tangible benefit to the estates, it concludes that none of the fees of WTC or its attorneys in this category are allowable as a substantial contribution claim.

In the Litigation category, Roulston and Ho testified that, as Committee co-chair, WTC and WF & G were directly involved in the Committee's investigation of potential claims that the Debtors' estates may have against third parties. In this regard, they met with plaintiffs' counsel in certain securities litigation to discuss settlement and allocation of potential recoveries between the estates and the shareholder plaintiffs. WTC and WF & G also interviewed and evaluated special counsel for the Committee to prosecute the potential claims against third parties. This evidence, however, supports the conclusion that WTC was simply performing routine tasks in its role as a member of the Committee which does not constitute a substantial contribution. *See, e.g., In re Baldwin–United Corp.*, 79 B.R. 321, 339 (Bankr. S.D.Ohio 1987). Therefore, the Court concludes that none of the fees in this category are allowable as an administrative claim under section 503(b)(3)(D) and 503(b)(4).

As noted above, however, the Court concludes that WTC did make a substantial contribution, in part, by the activities of its attorneys taken at the request of the Committee in the Plan and Disclosure Statement and Fletcher litigation categories. Consequently, the Court will allow WTC an administrative expense under section 503(b)(3)(D) and 503(b)(4) in the amount of $155,258.

### 3. *Section 503(b)(3)(F)*

WTC also asserts it is entitled to an administrative claim, particularly for its

work in the Committee/General category, under section 503(b)(3)(F) which allows an administrative claim for:

the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

. . . . .

(F) a member of a committee appointed under section 1102 of this title, if such expenses are incurred in the performance of the duties of such committee. . . .

11 U.S.C. § 503(b)(3)(F).

The Liquidating Trustee argues that this section does not support WTC's request for payment of its own employees on an hourly basis.[9] It contends that the legislative history to section 503(b)(3)(F) demonstrates that Congress did not intend to compensate a Committee member in that manner:

This section of the bill amends section 503(b) of the Bankruptcy Code to specifically permit members of Chapter 11 committees to receive court-approved reimbursement of their actual and necessary expenses. *The new provision would not allow the payment of compensation for services rendered by or to the committee members.*

H.R.Rep. No. 103–835, at 39 (1994), U.S.Code Cong. & Admin.News 1994, pp. 3340, 3348 (emphasis added).

▪ The Court agrees that section 503(b)(3)(F) does not allow payment of the hourly wages of a Committee member. Therefore, WTC's request for reimbursement of its employees' time cannot be allowed as an administrative claim.

▪ Notwithstanding the legislative history, courts have allowed reimbursement of a committee member's attorneys' fees. *See, e.g., In re First Merchs. Acceptance Corp.,* 198 F.3d 394, 399 (3d Cir. 1999) (interpreting sections 503(b)(3)(F) and 503(b)(4) "as permitting committee members to recover attorney's fees for work performed in connection with that entity's service on the committee"). This, however, is not a blank check. "The bankruptcy court retains the power to ensure that only those fees that are demonstrably incurred in the performance of the duties of the committee . . . are reimbursed." *Id.* at 403. "The burden of proving that the fees and expenses sought are reasonable and necessary is on the applicant." *In re Worldwide Direct, Inc.,* 259 B.R. 56, 60 (Bankr.D.Del.2001). "[T]he standard of what are necessary services is different when performed by a committee member as opposed to counsel for the committee." *Id.*

In determining whether a committee member's legal fees are reimbursable, it is not enough simply to determine what services are necessary; we must also determine whether it was necessary for a particular member of the committee to perform them. For example, we would not permit every member of a committee to negotiate separately with the debtor over the terms of the plan of reorganization because that would be impermissible duplication of effort.

Further, our determination of what is necessary is tempered by the fact that a committee is authorized to retain counsel, accountants, financial advisors and other professionals to assist the committee in performing its duties. In large cases, committee advisors are typically

---

9. WTC seeks $325 per hour for its in-house employees and the normal hourly rate of its outside counsel, adjusted annually.

retained and usually well-qualified to assist the committee in the performance of its duties. In such a case, it is difficult to justify allowing a committee member to hire its own legal counsel ... to perform duties which are also performed by committee professionals. To allow such expenses would permit unnecessary duplication of effort.

*Id.* at 61 (internal citations omitted).

 WTC contends nonetheless that the services of WF & G benefitted all creditors and not just the Noteholders. WTC reiterates its active participation in the various aspects of this case as set forth in Part III B2 above.

Resurgence is willing to concede that WTC is entitled to an administrative claim for its attorneys' fees for some Committee work. It argues, however, that the amount sought by WTC in this category ($370,-481.50) is excessive. It notes that another Committee member, Global Crossing, was awarded an administrative claim in the amount of $51,439 and argues that WTC should be awarded no more than that amount.

In particular, Resurgence argues that WTC did not (and cannot) demonstrate that the services were necessary and that it was necessary for WF & G (as opposed to Committee counsel) to perform them. Resurgence specifically objects to WTC charging an hourly rate for both Roulston and Ho to attend every Committee meeting, to participate in every Committee conference call, and to review all pleadings filed in the case. Resurgence asserts that there was no benefit to the estate by this duplication and that Roulston insisted on Ho's presence because Roulston did not have any bankruptcy experience. Resurgence argues that the estate should not have to pay for that inexperience.

The Court agrees with Resurgence. As noted above, most of the services provided by WF & G were to protect the Noteholders' own particular interests in the case. Those services are not compensable under section 503(b)(3)(F) because they are unrelated to the function of the Committee. Thus, they were neither necessary nor reasonable.

With respect to the Committee/General category, the Court agrees that most of those services are not allowable as an administrative claim. WTC conceded that counsel for the Committee was competent and experienced in bankruptcy matters. There was, therefore, no reason for WTC to act as anything more than a member of the Committee; it could rely on counsel for the Committee to represent adequately the interests of all creditors. In review of the time records, it is apparent that a majority of the services performed by Ho and his firm were merely for the convenience of WTC, to permit it to fulfill its fiduciary duties to the Noteholders as the Indenture Trustee or to the creditors as a member of the Committee. *See Worldwide Direct,* 259 B.R. at 62 (concluding that "attendance at a committee meeting by counsel for a member, in the absence of special circumstances, appears to be merely for the convenience of a member. It is not necessary for the functioning of the committee and is not compensable.").

However, the Court will allow the request of WTC for some compensation for its attorneys' services. *See, e.g., First Merchs.,* 198 F.3d at 399. The Court agrees with Resurgence that the amount awarded to Global Crossing is a good starting point. Because WTC served as co-chair of the Committee, the Court believes that more work was required of it and its attorneys. After reviewing the time records of WF & G, the Court is convinced that an award of $100,000 is appropriate as an administrative claim for

its work in the Committee/General category under section 503(b)(3)(F) and, consequently, section 503(b)(4).

### C. *Unsecured Claim*

WTC seeks the full amount of its fees and expenses, as well as those of its attorneys, minus any amounts authorized as an administrative claim, as an unsecured claim against the estate. It asserts it is entitled to such a claim under the confirmed Plan and the Indenture.

#### 1. *Untimely Objections*

WTC argues that Resurgence should not be permitted to object to its fees after the fact. WTC notes that Resurgence never objected to any of the actions taken by WTC or its counsel. Specifically, Resurgence never objected to WTC serving on the Committee or serving as Committee co-chair. In fact, Resurgence urged WTC to be active in the AT & T sale process, the Plan drafting process, and in objections to certain claims. On many occasions, Resurgence contacted WF & G for updates on the status of the case. At no time did Resurgence tell WTC or WF & G that it felt their services were unnecessary.

WTC notes that the Indenture gives the Noteholders, such as Resurgence, the right to give directions to the Indenture Trustee and even to replace it if they are unhappy. (Indenture at §§ 7.8 & 10.1.) In fact, at the insistence of Resurgence, WTC resigned from the Liquidation Trust Board after the Plan was confirmed. Therefore, WTC argues that the failure of Resurgence to object or to direct WTC to resign from the Committee earlier bars it from objecting now to the fees incurred by WTC in serving on the Committee.

The Court agrees with WTC that Resurgence cannot now argue that none of WTC's services benefitted the Noteholders when Resurgence itself relied on WTC and its counsel to keep it advised of the progress in the case. Nor can Resurgence argue that WTC should not have retained counsel, when Resurgence used that counsel to keep itself apprised of developments in the case. The Court is also persuaded that Resurgence's delay in restricting the activities of WTC is evidence that Resurgence believed that those activities did provide a benefit to the Noteholders. Nonetheless, the Court believes that none of these factors prevents Resurgence (or the Court) from reviewing the reasonableness of the fees sought under the Indenture.

#### 2. *Unequal Treatment of Creditors*

Resurgence argues that the Court should substantially reduce WTC's fees and expenses under the Indenture [10] because the Noteholders should not have to bear the cost of services rendered generally to the estate merely because those services were not compensable from the estate. At the same time, Resurgence argues that WTC is not entitled to an administrative claim for those services because they were not rendered for the benefit of all creditors, but only for the benefit of the Noteholders. Resurgence cannot have it both ways. To the extent the services rendered by WTC were not allowable as an administrative claim because they provided a benefit to the Noteholders only, it is appropriate that the Noteholders pay for them.

Resurgence argues nonetheless that to charge the Noteholders for payment of the Indenture Trustee's expenses would be to treat them differently from other unsecured creditors. This, it asserts, would

---

**10.** Resurgence believes that WTC should be entitled to an unsecured claim for only $351,432 in addition to any allowed administrative claim.

violate the Bankruptcy Code. *See* 11 U.S.C. § 1123(a)(4) (all creditors in the same class must receive the same treatment).

The Liquidating Trustee argues that WTC's claim should not be allowed in addition to the claims of the Noteholders, but should be paid from the Noteholders' distributions. To hold otherwise, it asserts, would prejudice the other unsecured creditors.

■ The Court rejects these arguments. The confirmed Plan already decided this issue by providing that WTC's claim will be allowed as "an additional component of the Allowed Noteholder Claims." (Plan at § 5.6.1.) The confirmation of the Plan is binding and cannot now be collaterally attacked. *See, e.g., First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough (In re Varat Enters., Inc.)*, 81 F.3d 1310, 1315 (4th Cir. 1996). Thus, to the extent the Court concludes that WTC has a valid claim under the Indenture, it will be allowed as an unsecured claim in addition to the Noteholders' claims.

### 3. *Contract Terms*

■ An indenture trustee has a fiduciary duty to the noteholders and is required to act with the same care as if it owned the investment. *See, e.g., Flight Transp. Corp.*, 874 F.2d at 578 (citing Trust Indenture Act of 1939, 15 U.S.C. § 77aaa-*ooo*(c)). The Indenture in this case incorporates this standard by mandating that WTC's services be performed with "the same degree of care and skill in their exercise as a prudent Person would exercise or use under the circumstances in the conduct of his own affairs." (*See* Indenture at § 7.1(a).)

■ If the indenture trustee fulfills its duties, it is entitled to reimbursement of its expenses, including attorneys' fees, in accordance with the terms of the indenture. *See, e.g., Flight Transp. Corp.*, 874 F.2d at 583 (holding that the indenture trustee has a separate contractual claim for its fees and expenses); *In re W.T. Grant Co.*, 119 B.R. 898, 900 (S.D.N.Y. 1990) ("[A]n indenture trustee is contractually entitled to payment for performance of its duties regardless of whether its efforts benefitted the estate.") (citations omitted).

In this case, the Indenture provides that the Debtors agree "to pay to the Trustee from time to time such *reasonable* compensation as the [Debtors] and the Trustee shall from time to time agree in writing for all services rendered by it hereunder. The [Debtors] shall reimburse the Trustee upon request for all *reasonable* disbursements, expenses, and advances incurred or made by it. Such expenses shall include the *reasonable* compensation, disbursements and expenses of the Trustee's agents, accountants, experts and counsel." (Indenture at § 7.7 (emphasis added).)

Resurgence argues that WTC did not exercise the degree of care required of a prudent person because it did nothing to assure that the expenses incurred by it and its attorneys were reasonable. In reply, WTC maintains that it did exercise the requisite care and that its expenses were reasonable in light of the tasks it was bound to perform as the Indenture Trustee.

#### a. *Terms in Writing*

■ Resurgence initially objects to WTC's claim *in toto* because there is no specific written agreement in this case covering the services to be rendered or the hourly rate to be charged. Resurgence notes that the Indenture requires that the Debtors "agree from time to time *in writing*" to WTC's compensation. (Indenture at § 7.7 (emphasis added).)

WTC responds that there was a written agreement between it and the Debtors in 1997 approving the general administrative fees to be charged. That agreement also stated that:

Charges for any services not specifically covered in this schedule will be billed commensurate with the services rendered. This schedule reflects charges which are now in effect for our normal and regular services and are subject to modification where unusual conditions or requirements prevail, and does not include counsel fees or expenses and disbursements, which will be billed at cost.

(Exhibit Q.) That agreement also gave WTC discretion to determine which services were "normal" and which were unusual and required additional compensation.

The Court concludes that the 1997 agreement is sufficient to satisfy the requirement of a written agreement to pay WTC's fees. The Debtors apparently agree because they did not contest the issue and provided in the Plan that WTC's fees would be allowed as a claim and charging lien.

Resurgence specifically argues, however, that WF & G's hourly rates should be rolled back to those in effect at the beginning of the case in January 1999, because there was no engagement letter or other writing reflecting the rates which WF & G would charge (or the expectation that its rates would increase over the life of the engagement).

The Court disagrees. The Indenture does not require that the Debtors approve the amount of fees of counsel for WTC. Nor does it require that WTC receive a written engagement letter from counsel setting forth its rates. In fact, the 1997 agreement grants broad discretion to WTC to determine the type and amount of services necessary to fulfill its fiduciary obligations under the Indenture and states that attorneys' fees would be billed (and paid) at cost. Accordingly, the Court concludes that it was not necessary for the Debtors to approve the rates of WTC's attorneys.

### b. *Amount of Fees*

Resurgence argues that the amount of the fees sought by WTC (over $1.6 million) is unreasonable in this case. The Liquidating Trustee asserted that WTC's fees were unreasonable because the total professional fees in the case are approximately 18 percent of the expected recovery of unsecured creditors. WTC responds that its fees and expenses represent only 2.8 to 3.9 percent of the Noteholders' recovery, which it asserts is reasonable. The Court, however, must determine the reasonableness of fees based on more than simply the percentage of recovery.

In determining the reasonableness of fees, courts have historically used the lodestar approach which multiplies a reasonable hourly rate by the reasonable number of hours to perform the task required. *See, e.g., Busy Beaver*, 19 F.3d at 849 n. 21. The burden of proof is on the applicant, but "[t]he court may consider corroborating testimony as well as its first-hand observations of services." *Granite Partners*, 213 B.R. at 447 (citation omitted).

### i. *Hourly Rates*

Resurgence contends that the hourly rates charged by WTC for both its own employees and its counsel are unreasonable. Specifically, Resurgence asserts that WTC's in-house rate of $325 per hour is unreasonable because WTC's representative had no bankruptcy experience yet was charging more than its local counsel who had extensive bankruptcy experience. Resurgence asks the Court to reduce WTC's hourly rate to $189, the amount charged by its local counsel.

WTC responds that it is arbitrary to reduce its hourly rates as Resurgence suggests. WTC asserts that it was unnecessary for its in-house personnel to have bankruptcy experience, because that was provided by its bankruptcy counsel. Further, Roulston had extensive business experience with distressed debt. WTC submitted evidence that it charged the same competitive rate it charged other customers for extraordinary, post-default services, which is consistent with the market rate.

Resurgence acknowledged that the Indenture Trustee is entitled to a reasonable fee, at an hourly rate, for extraordinary services it may perform after a default. Further, Resurgence was unable to rebut WTC's evidence that the hourly rates charged by it are comparable to those charged by other indenture trustees in similar circumstances. Therefore, the Court finds that WTC's in-house hourly rates are reasonable.

█ With respect to the rates charged by WTC's bankruptcy counsel, Resurgence argues they are unreasonable for several reasons. Resurgence contends that WTC did not act as a prudent person when it chose, by rote, extremely expensive New York counsel. The Court disagrees and finds the selection of WF & G was reasonable. WF & G had been involved in the issuance of the original notes under the Indenture, had a prior relationship with WTC and was experienced in bankruptcy matters. The retention of local counsel such as KRL & S is required in this District and, therefore, was necessary.

Next, Resurgence contends that, because there was no written engagement letter, WF & G's hourly rates should be rolled back to those in effect at the beginning of the case in January 1999. Resurgence notes that there were several undisclosed increases aggregating over 21%

during the course of this case, as explained in the report of the Liquidating Trustee's Fee Examiner. WTC disagrees. Both Roulston and Ho testified that they reviewed WF & G's monthly bills and discussed billing issues that arose. Ho testified that he had advised WTC of the annual increases, a matter he usually discusses with his clients. He also noted that the annual increases in hourly rates were fully disclosed on the face of the firm's invoices. The Court rejects Resurgence's argument. It is not unusual for attorneys' rates to increase annually. The evidence presented was that this was reviewed with WTC, who did not object. Therefore, the Court will accept the hourly rates as reflected in the bills.

Lastly, Resurgence argues that the hourly rates charged are unreasonable because the work done by Ho (who logged over 1,400 hours) could largely have been done by a lower billing associate. This is particularly so with respect to the routine meetings of the Committee. The Court agrees with Resurgence that the rate charged for attendance at those meetings was unreasonable. Rather than reduce the rate for that time, however, the Court will eliminate those charges altogether for the reasons stated below.

### ii. *Number of Hours*

Resurgence objects to the fees requested, arguing that the parties spent too much time on this case where all the assets had been liquidated shortly after the case began. In particular, Resurgence argues that WTC did not exercise the care required under the prudent person standard because it allowed duplication resulting in a reduced recovery for the Noteholders. Resurgence contends that the Noteholders and other unsecured creditors were completely aligned with each other, as evidenced by their equal treatment under the Plan. Therefore, Resurgence ar-

gues that there was no reason to have three firms (Committee counsel, WF & G, and KRL & S) representing the interests of the Noteholders.[11]

WTC disagrees with Resurgence's arguments. WTC notes that Resurgence's representative acknowledged that it is not unusual for an indenture trustee (in fulfilling its fiduciary duty to noteholders) to serve on a creditors' committee, even as chair. Resurgence also conceded that indenture trustees hire counsel to assist them in fulfilling their fiduciary duties, particularly in bankruptcy cases. Finally, Resurgence itself relied on WTC and its counsel to act in this case. Therefore, WTC asserts that the number of hours expended by it and its counsel was reasonable.

 In awarding fees, the Court must "decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are 'excessive, redundant or otherwise unnecessary'." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 711 (3d Cir.2005) (citation omitted). "Where an opposing party lodges a sufficiently specific objection to an aspect of a fee award, the burden is on the party requesting the fees to justify the size of its award." *Id.* at 713.

 WTC spent 633.6 hours in this case. Given the length of this case and WTC's fiduciary duties as the Indenture Trustee and a member of the Committee, the Court finds that the number of hours spent by WTC was reasonable. Thus, the Court will allow $282,964.50 in fees and $5,481.73 in expenses as an unsecured claim.[12]

 The amount of time spent by WF & G is another matter. WF & G spent a total of 3,061.1 hours on this case; over 1,400 hours were spent by the partner on the file, Ho, while only 1,000 hours were spent by all associates on the file. The time records reveal an excessive amount of work on matters that were unnecessary or duplicative. This was not an unusually complicated case; it involved essentially the sale of all assets of the Debtors in the first four months of the case. The secured claims were all paid in full from the sale and the assets left were available to unsecured creditors. The Noteholders were in the same class and had the same interests as all other unsecured creditors. With the exception of the senior debt issue, the Noteholders' interests could be adequately represented by Committee counsel.

WTC argues, however, that it would have been imprudent for it to rely on Committee counsel and could have subjected WTC to liability. Although WTC acknowledges that WF & G's services concerned the same subject matter as work performed by Committee counsel, it asserts that WF & G's role was more limited and supplemental. The Court disagrees with WTC. While it was prudent of WTC to hire its own attorneys, it had an obligation to assure that the firm only did what was necessary to protect the Noteholders' interests.

WTC asserts that it and its counsel were sensitive to the need to avoid duplication. Roulston testified that it was his practice to "coordinate [counsel's] efforts to see that they weren't going off in directions that seemed unproductive and at the same time keeping them focused on directions

---

11. Fees charged by those firms were $5 million, $1.2 million, and $63 thousand, respectively.

12. These figures are the amounts requested in WTC's Amended Application. Resurgence has not objected specifically to any of the expenses.

that would be productive." Ho similarly testified that he and Roulston had specific discussions concerning fees and how to manage the case. Resurgence argues, however, that there is no evidence that WTC ever reduced bills or complained of duplicative or non-productive time.

The Court finds the testimony of Roulston and Ho to be self-serving. Although Ho testified that he reviewed the monthly bills to eliminate unnecessary or inappropriate fees, it is not surprising that he apparently did not cut his own hours. The Court finds that the number of hours spent by WF & G (and particularly by Ho) was excessive. The Court concludes that, many of the services rendered by WF & G merely duplicated services performed by counsel for the Committee. It was unreasonable for WF & G to perform them and WTC cannot be reimbursed for them.

The bulk of the time spent by WF & G (805.60 hours, or 26.3%) was spent in the Committee/General category. Resurgence argues that because of Roulston's inexperience in chapter 11 matters, Ho effectively became a member of the Committee, without court approval, at his full hourly rate. Resurgence argues that this substitution of outside counsel for a Committee member was improper. The Court has already stated, in this very case, its belief that Committee members' attendance at Committee meetings through counsel was not advisable (or compensable under section 503(b)(4)):

> If we were to allow committee members to participate on committees solely through their counsel, the benefits of the business and industry expertise of the members would be lost.... Therefore, we conclude that normally it is necessary for a committee member, not its counsel, to attend committee meetings.

*Worldwide Direct,* 259 B.R. at 62.

In this case, Ho attended almost every Committee meeting, performed such business-related tasks as interviewing prospective crisis managers, interviewing counsel in litigation against third parties and claims against the estate, and serving (in lieu of his client or any other Committee member) as a member of the Plan working group. This he did regardless of whether the meeting or call impacted on the senior debt issue or other matters peculiar to the Noteholders' interests. Such services were not reasonably necessary or compensable. *See, e.g., In re General Homes Corp. FGMC, Inc.,* 143 B.R. 99, 103 (Bankr.S.D.Tex.1992) (concluding that "services provided by [Indenture Trustee] and its various counsel ... in attending Committee meetings and in bringing in-house and outside counsel to meetings of the Committee, were not beneficial to the estate or its unsecured creditors, and arguably were not beneficial even to the noteholders themselves"). Consequently, the Court will disallow fees for all the time spent by WF & G in the Committee/General category, except those already allowed above as an administrative claim.

Similarly, the Court concludes that the time spent by WF & G (other than as allowed as an administrative claim) in the AT & T Sale, Financing, Litigation, and Plan/Disclosure Statement categories were duplicative of services rendered by Committee counsel and were not reasonably incurred. The Court will allow the time spent by WF & G (that has not already been allowed as an administrative claim) in the Fletcher, Claims, Noteholders and Senior Debt categories, however, as they appear to be categories of services necessary to protect the interests of the Noteholders separate from their interests as general unsecured creditors. Those fees total $291,352.

██ There was no specific objection to the time spent by (or the rates charged by)

KRL & S. Resurgence merely suggests that because KRL & S simply supported WF & G throughout the case, that KRL & S's fees should be reduced by the same percentage as WF & G's fees. The Court concludes that KRL & S's fees should be allowed only to the extent they fall into the categories the Court finds were necessary to protect the separate interests of the Noteholders. Those fees total $21,434. In addition, the Court will allow the expenses requested by each firm ($44,784.45 and $3,856.53, respectively) as no objection has been raised to them and they appear to be reasonable.

### D. Post–Effective Date Application

■ WTC also seeks an additional $99,055.54 as an unsecured claim with a charging lien for services performed by WF & G after confirmation.[13] WTC asserts that those services included objecting to claims asserted as senior debt, implementing the Plan through assurance of distributions to the Noteholders, and responding to various Noteholder inquiries.

Resurgence concedes that approximately $55,000 of the fees requested are allowable, as they represent work done on the senior debt issue. Nonetheless, it objects to those fees (and the remainder of the request), arguing that it is duplicative of prior work done or work performed by the Committee.[14]

At the hearing, many of the allegedly "vague" entries were clarified. The Court will, however, disallow the portion of the fee application that is duplicative of the post-effective date Committee's duties ($14,279 as reflected in Resurgence's Objection). The latter is not allowable as it is

unreasonable for the Indenture Trustee to allow its counsel to duplicate work being done by the Committee for all unsecured creditors, including the Noteholders. From reviewing this and the Applications, the Court will, however, allow the remainder of the fees requested by WF & G as it largely represents work done on the senior debt issue.

Consequently, the Court will allow the Supplemental Application in the amount of $77,898 in fees and $6,878.54 in expenses as an unsecured claim.

### E. Charging Lien

■ WTC seeks the full amount of its fees and those of its attorneys, minus any amounts authorized as an administrative claim, as a charging lien against any distribution to the Noteholders under the Plan. It relies on the terms of the Indenture, which grants WTC a charging lien against any and all distributions to the Noteholders for its expenses and requires that WTC be paid before payments to the Noteholders. (Indenture at §§ 6.4 & 6.6.) The same order of payment is set forth in the Plan. (Plan at § 5.6.1(b).)

WTC also asserts that section 6.4 of the Indenture requires that any disallowed portion of its claim must still be paid to it and constitutes a charging lien on any distribution that would otherwise go to the Noteholders. The Court disagrees. The actual language of the Indenture, upon which WTC relies, provides:

> To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trust, its agents and counsel, *and any other*

---

13. WTC did not seek an administrative claim for these services.

14. Resurgence also asserts, as it did with respect to the original and Amended Applications, that the fees of WF & G must be rolled back to the rates in effect at the commencement of the case. For the reasons set forth in Part III C3b above, the Court rejects this argument.

*amounts due the Trustee under Section 7.7* out of the estate in any such proceeding shall be denied for any reason, payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the [Noteholders] may be entitled to receive in such proceeding, whether in liquidation or under any plan of reorganization or arrangement or otherwise. (Indenture at § 6.4 (emphasis added).)

The Court concludes that to have a charging lien, WTC must first have a claim allowable under section 7.7 of the Indenture. As the Court found in Part III C and D above, the amounts claimed by WTC are not all allowable under section 7.7 and the other provisions of the Indenture. Therefore, the Court concludes that they are similarly not allowable as a charging lien. To hold otherwise would eliminate the requirements under the Indenture that WTC act as a prudent person and that its expense claim be reasonable.

The Plan does not provide any additional support for WTC's position. The Plan states that "the Indenture Trustee may request that all or any portion of its Claim in respect of the Charging Lien be allowed as an Unsecured Claim" and that "[a]ny amount of the Charging Lien that is allowed as an Unsecured Claim by the Bankruptcy Court pursuant to a Final Order shall constitute an additional component of the Allowed Noteholder Claims." (Plan at § 5.6.1(a).) The Plan defines WTC's Charging Lien as "any lien or other priority in payment *available to the Indenture Trustee pursuant to the Indenture* . . . for payment of any fees, costs or disbursements incurred by such Indenture Trustee including, without limitation, all such fees, costs, disbursement or advances incurred from and after the Effective Date." (Plan at § 1.2.17 (emphasis added).)

As noted in Part III C and D above, the Indenture only allows reasonable compensation to WTC, which the Court has found to be $734,649.75. Consequently, the Court concludes that under the Plan WTC is entitled to a charging lien for this amount.

## IV. CONCLUSION

For the reasons set forth above, the Court will grant WTC's request for an administrative claim under section 503(b)(3)(F) and 503(b)(4) in the amount of $255,258. The Court will further award WTC, as a *general unsecured claim with a charging lien to be paid prior to any distribution to the Noteholders, the following fees and expenses: (1) WTC's own fees and expenses ($282,964.50 in fees and $5,481.73 in expenses); (2) the fees of WF & G and KRL & S in the categories the Court determined were for the benefit of the Noteholders (Fletcher, Claims, Noteholders and Senior Debt), less the administrative fees allowed in those categories and all their requested expenses ($336,136.45 and $25,290.53, respectively); and (3) $77,898 in fees and $6,878.54 in expenses of WF & G requested by WTC for post-effective date services. The total unsecured claim allowed hereby ($734,649.75) shall be paid before the distributions to the Noteholders in accordance with the priorities set forth in the Indenture and the Plan.

An appropriate order is attached.

## ORDER

AND NOW, this **30th** day of **NOVEMBER, 2005**, upon consideration of the Amended Application of Wilmington Trust Company ("WTC") as Indenture Trustee for (A) Allowance of its Claim in Respect to the Charging Lien as Unsecured Claim; (B) Payment of the Charging Lien and Allowance of Requested Amounts to be

Treated as Advance Against Distributions; and (C) Allowance of Administrative Expense Claim filed on August 14, 2001, and the Application of WTC for Approval of Fees and Expenses of its Counsel for Services Rendered during the Post–Effective Date Period filed on August 15, 2005, and the Objections thereto by the Liquidating Trustee and by Resurgence Asset Management L.L.C., and for the reasons stated in the accompanying Opinion, it is hereby

**ORDERED** that the Applications are hereby **GRANTED IN PART**; and it is further

**ORDERED** that WTC is hereby allowed an administrative claim pursuant to sections 503(b)(3)(D) and (F) and 503(b)(4) in the amount of \$255,258; and it is further

**ORDERED** that WTC is hereby allowed an unsecured claim in the amount of \$734,649.75 which shall be allowed in addition to (and as a charging lien on) the distributions due to the Noteholders under the confirmed Plan.