**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 25-1136
_____

In re: BOY SCOUTS OF AMERICA, et al.,
Debtors


COALITION OF ABUSED SCOUTS FOR JUSTICE,
Appellant
_____

Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1:23-cv-01443)
District Judge: Honorable Richard G. Andrews
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
November 10, 2025
_____

Before: SHWARTZ, MATEY, and MONTGOMERY-REEVES, <u>Circuit Judges</u>.

(Filed: November 21, 2025)
_____


_____

OPINION[*]
_____
_____

---

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

SHWARTZ, Circuit Judge.

The Coalition of Abused Scouts for Justice (the "Coalition"), an ad hoc group of sexual abuse tort claimants who participated in the bankruptcy of the Boy Scouts of America and Delaware BSA, LLC (the "Debtors"), appeals the District Court's order affirming the Bankruptcy Court's order denying the Coalition's request for the payment of its professional fees under 11 U.S.C. §§ 363(b) and 503(b)(3)(D) and (4). Because § 363(b) is not an appropriate vehicle for a creditor's request for professional fees, and because the Bankruptcy Court's determination that the Coalition did not make a "substantial contribution" to the estate as required under § 503(b)(3)(D) was not clear error, we will affirm.

I

A

The Debtors, non-profit corporations that provide adult-run youth programs, filed for bankruptcy due to numerous lawsuits alleging sexual abuse by adult volunteers and declining membership. Shortly after the Debtors filed for bankruptcy, the United States Trustee appointed a Future Claimants' Representative, an official committee of unsecured trade creditors, and an official committee representing all sexual abuse tort

2

claimants (the "TCC").  Those official committees employed professionals under 11 U.S.C. § 1103(a).

Tort lawyers (the "State Court Counsel") representing 60,000 survivors, a majority of the tort claimants against the Debtors, formed the Coalition due to disagreements about the TCC's strategy.[1]  The Coalition began participating in the bankruptcy and retained its own professionals.  Under agreements with these professionals, the State Court Counsel directed the professionals' actions in the bankruptcy cases and paid them for their services.  The Coalition represented to the Bankruptcy Court that the State Court Counsel would not "charge back the fees of any of the Coalition's professionals to the individual survivors in any way, including by reducing an individual survivor's claim distribution."[2]

---

[1] Specifically, the Coalition focused on achieving a global settlement with the Debtors' insurers, while the TCC worried that their clients would be harmed if they lost the right to pursue the Debtors' network of local councils that administer the Boy Scout programs in their respective geographic areas (the "Local Councils") directly in tort.  To demonstrate its work to reach a global settlement, the Coalition points to affidavits indicating that it took a lead role to negotiate a settlement with the Local Councils, who had formed their own ad hoc group.  The Coalition also points to affidavits describing that it took a lead role in negotiating a settlement with two of the Debtors' insurers, Hartford and Century, and that it incurred substantial professional fees doing so.  The TCC, in contrast, pointed to evidence showing that the TCC formulated the basis to increase the settlement with the Local Councils.

The Coalition also cites evidence that, while the Coalition was participating in settlement negotiations, the TCC actively opposed the reorganization plan.  The TCC, however, emphasized that the TCC ultimately achieved its restructuring goals in the confirmed plan.

[2] The State Court Counsel also informed their tort clients that "a portion of the fees and expenses incurred" by the retained law firms would be paid by the State Court Counsel "and any payment of such fees and expenses . . . will not increase the fees and expenses owed by" the tort clients.

App. 81. The Coalition, however, expressly reserved its right to pursue reimbursement from the estate.

About a year and a half after filing their bankruptcy petitions, the Debtors moved to enter a restructuring support agreement (the "RSA"). Therein, the Debtors proposed paying the Coalition's professional fees under 11 U.S.C. § 363(b).[3] The Bankruptcy Court could not determine whether it would be permissible for the Debtors to pay the Coalition's professional fees until it knew the outcome of the Coalition's efforts and left it to the parties to decide whether they wanted to proceed with the remaining aspects of the RSA. The parties never submitted a revised order, so the Bankruptcy Court did not authorize the Debtors to enter the RSA.

Around the same time, the Debtors filed a reorganization plan and several amendments to the proposed plan. A modified fifth amended plan proposed that the Coalition's professional fees (1) could be capped at $21 million, and (2) would be reimbursed "[o]n or as soon as practicable after the Effective Date, and subject to the Bankruptcy Court granting a [fee] motion filed pursuant to §§ 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable

---

[3] At the evidentiary hearing on the RSA motion, the Debtors' witnesses testified that the Coalition's participation in negotiations benefited the Debtors by allowing them to negotiate with a single survivor-facing entity rather than numerous law firms, but they had no documentation about the Coalition's professional fees and so no way to determine whether any amounts the Debtors agreed to pay would be for services rendered "to advance [the Coalition's] own specialized interests as opposed to . . . the interest of all claimants." Supp. App. 291-92.

4

bankruptcy and non-bankruptcy law." Bankr. D. Del. Dkt. 8813 § V.T.1. The plan also set forth a process for the Coalition to submit their "reasonable, documented, and contractual professional advisory fees" for the Debtors' review. Bankr. D. Del. Dkt. 8813 §§ II.A.2, V.T.1. The Bankruptcy Court confirmed the modified fifth amended plan[4] with an Effective Date of April 19, 2023. The Bankruptcy Court acknowledged that the "Debtors' agreement" that "the Coalition's fees will be brought separately," id. at 678 n.763, emphasized that the Bankruptcy Court would not approve the request to pay "the Coalition fees . . . as part of the plan," and instead would later decide whether the Debtors could pay the Coalition fees based "on all appropriate factors," App. 648. The Debtors never filed another request to pay the Coalition's fees.

B

A few months after the plan was confirmed, the Coalition moved to approve the Debtors' Proposed Payment of the "Coalition Restructuring Expenses," seeking $21 million in fees and expenses billed by its retained professionals either (1) under § 363(b) as a sound exercise of the Debtors' business judgment, or (2) as a substantial contribution

---

[4] See In re Boy Scouts of Am. & Delaware BSA, LLC ("Boy Scouts I"), 642 B.R. 504 (Bankr. D. Del. 2022), supplemented, No. 20-10343, 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022), aff'd, 650 B.R. 87 (D. Del. 2023), aff'd in part, rev'd in part, dismissed in part sub nom. In re Boy Scouts of Am., 137 F.4th 126 (3d Cir. 2025), and aff'd, 650 B.R. 87 (D. Del. 2023).

award under § 503(b)(3)(D) and (4).[5]  The Debtors did not submit any argument in support of the motion.

The Bankruptcy Court denied the Coalition's motion, concluding that (1) § 363(b) was not applicable because the motion was brought by the Coalition rather than the Debtors, and the Debtors did not move to pay the Coalition's professional fees after the plan was confirmed, and (2) the Coalition had not satisfied the standard for reimbursement of professional fees under § 503(b) because the Coalition's professionals' services duplicated many of the services that the TCC's or the Debtors' professionals provided, the Coalition's work did not transcend the Coalition's self-interest, and the Coalition's Verified Fee Statements included many services that, on their face, benefited only the Coalition and were not reasonable or necessary for the estate.  In re Boy Scouts of Am. ("Boy Scouts II"), No. 10808, 2023 WL 8449557, at *4, 8-10 (Bankr. D. Del. Dec. 5, 2023), aff'd, 666 B.R. 489 (D. Del. 2025).[6]

The District Court affirmed the Bankruptcy Court's order.  In re Boy Scouts of Am. ("Boy Scouts III"), 666 B.R. 489, 510 (D. Del. 2025).  As to § 363(b), the District Court concluded that (1) the Coalition was not statutorily authorized to file for relief under that section; (2) the Coalition could not challenge the Bankruptcy Court's orders

---

[5] In support of its motion, the Coalition submitted third-party declarations attesting to the Coalition's contributions to the settlements with the Local Councils.

[6] The Bankruptcy Court also concluded that the standard applied was not dispositive because, at the RSA hearing, the Debtors had not demonstrated that their decision to pay the Coalition's professional fees was a proper exercise of business judgment.  Boy Scouts II, 2023 WL 8449557, at *4.

6

concerning the Debtors' fee requests that preceded the confirmation order because these orders merged into the confirmation order, which was a final order that the Coalition did not appeal; and (3) with respect to the denial of the Coalition's motion, the Bankruptcy Court did not clearly err in concluding that the Coalition did not prove that the Debtors exercised business judgment in seeking to pay the Coalition's fees. Id. at 501-06. As to § 503(b), the District Court held that the Bankruptcy Court properly applied the governing standard, and the record supported its findings that (1) the Coalition's professionals duplicated the TCC's work; (2) the Coalition's contributions did not transcend self-interest; (3) the Coalition failed to review their Verified Fee Statements to request only fees that were reasonable and necessary for the estate as a whole; and (4) the request was inconsistent with the Coalition's prior representations to the Bankruptcy Court and its clients that the professional fees would be paid by the State Court Counsel. Id. at 508-10.

The Coalition appeals.

## II[7]

## A

We first examine the Coalition's request for fees under § 363(b). Section 363(b) provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease,

---

[7] The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157(a) and (b) and 1334(a) over the chapter 11 bankruptcies filed by the Debtors as well as the Coalition's motion seeking to have the bankruptcy estates pay the Coalition's professional fees. The

District Court had jurisdiction to review the Bankruptcy Court's order denying the Coalition's motion for professional fees under 28 U.S.C. § 158(a)(1). We have jurisdiction to hear the appeal of the order denying the Coalition's motion for professional fees, which was resolved after the confirmation order was entered, under 28 U.S.C. § 158(d)(1).

We lack jurisdiction to review the two interlocutory orders denying the Debtors' requests to pay the Coalition's professional fees under § 363(b). Those orders merged with the confirmation order, In re Westinghouse Sec. Litig., 90 F.3d 696, 706 (3d Cir. 1996), which is considered a final, appealable order as to "any issue actually litigated by the parties and any issue necessarily determined by the confirmation order," Bullard v. Blue Hill Bank, 575 U.S. 496, 502 (2015) (quoting 8 Collier on Bankruptcy ¶ 1327(1)(c) (16th ed. 2014)). The interlocutory order denying the Debtors' first request merged with the final order because the request was made through a motion to enter the RSA, and the RSA dissolved by its own terms when the confirmation order was entered. See Bullard, 575 U.S. at 502 ("When the bankruptcy court confirms a plan, its terms become binding on debtor and creditor alike."). The interlocutory order denying the Debtors' second request to reimburse the Coalition's professional fees also merged with the final order because the Debtors failed to renew their fee request after the confirmation order was entered. Although the modified fifth amended plan provided that the payment of the Coalition's professional fees would be made "subject to the Bankruptcy Court granting a motion," Bankr. D. Del. Dkt. 8813 §§ II.A.2, V.T.1, no such motion was filed. The Debtors' failure to file a separate motion, despite receiving leave to do so, rendered the confirmation order final as to the Debtors' request. Appeals of the confirmation order, and those orders merged into it, must be filed within fourteen days of entry. Because the appeal here was filed more than one year past that deadline, we lack jurisdiction to review the two orders that merged into the confirmation order.

As to the order over which we have jurisdiction,

> [w]e exercise plenary review of an order from a district court sitting as an appellate court in review of a bankruptcy court and we will review both courts' legal conclusions de novo. We review a bankruptcy court's factual findings for clear error. We engage in a mixed standard of review for mixed questions of law and fact, and apply a clearly erroneous standard to 'integral facts,' but exercise plenary review of the court's interpretation and application of those facts to legal precepts.

In re Nortel Networks, Inc., 669 F.3d 128, 136-37 (3d Cir. 2011) (footnote omitted) (citation omitted). Decisions left to a court's discretion are reviewed "for abuse thereof." In re Trans World Airlines, Inc., 145 F.3d 124, 131 (3d Cir. 1998).

8

other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b). The statute further provides that if a trustee is not appointed under § 1104, the debtor serves as a "debtor in possession" with many of the powers granted to a trustee. Id. §§ 1101(1), 1104, 1107 & 1108; see also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 n.3 (2000) (explaining that debtors in possession "are expressly given the rights and powers of a trustee by 11 U.S.C. § 1107"). These powers include the authority to seek relief under § 363. 11 U.S.C. §§ 363(b) & 1107(a).

To determine whether the Coalition, who is neither the trustee nor debtor, may seek relief under § 363, we begin with the statute's text. In re FTX Trading Ltd., 91 F.4th 148, 153 (3d Cir. 2024). "We presume [Congress's] intent is expressed through the ordinary meaning of the statute's language." Id. If the language is clear, "the sole function of the courts—at least where the disposition required by the text is not absurd— is to enforce [the statute] according to its terms." Id. (internal quotation marks omitted).

The Bankruptcy Code identifies who may invoke § 363(b): the "trustee" and the "debtor in possession." 11 U.S.C. §§ 363(b) & 1107(a). "Where a statute . . . names the parties granted [the] right to invoke its provisions, . . . such parties only may act." Union Planters, 530 U.S. at 6-7 (internal quotation marks and citations omitted) (alterations in original). Interpreting a different provision of the Bankruptcy Code that included the phrase "the trustee may," the Supreme Court has held that such language conveys that only the trustee or debtor in possession had the authority to take the action set forth in that provision. Id. (analyzing 11 U.S.C. § 506(c)). When Congress repeats language

9

within a statutory scheme, we are to infer that it ascribes the same meaning each time it uses one phrase. Monsalvo v. Bondi, 145 S.Ct. 1232, 1242 (2025). Because the statute here permits only the "trustee" to act, and the Coalition is neither the trustee nor the debtor in possession, it is not authorized to seek relief under § 363(b), and thus § 363(b)'s business judgment standard does not apply to the Coalition's request for professional fees.

## B

The Bankruptcy Court also did not clearly err by concluding that the Coalition had not made a "substantial contribution" under § 503(b) and thus properly denied its fees under that section.

### 1

Creditors who participate in a bankruptcy proceeding must ordinarily bear their own expenses and attorneys' fees. See Baker Botts L.L.P. v. ASARCO LLC, 576 U.S. 121, 126-27 (2015). The Bankruptcy Code provides a limited exception to this rule: a creditor who makes a "substantial contribution" to a debtor's bankruptcy case may

recover "the actual necessary expenses" from the estate.[8]  11 U.S.C. § 503(b)(3)(D), (b)(4).

"In determining whether there has been a 'substantial contribution' pursuant to § 503(b)(3)(D), the applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors." Lebron v. Mechem Fin. Inc., 27 F.3d 937, 944 (3d Cir. 1994) (quoting In re Lister, 846 F.2d 55, 57 (10th Cir. 1988)).  "Inherent in the term 'substantial' is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests." Id.  "Creditors are presumed to be acting in their own interests until they satisfy the court that their efforts have transcended self-protection." Id.  While

> [m]ost activities of an interested party that contribute to the estate will also, of course, benefit that party to some degree, and the existence of a self-interest cannot in and of itself preclude reimbursement . . . 'substantial contribution' should be applied in a manner that excludes reimbursement in connection with activities of creditors and other interested parties which are designed primarily to serve their own interests and which, accordingly, would have been undertaken absent an expectation of reimbursement from the estate.

Id.

To assess a creditor's substantial contribution, bankruptcy courts in this Circuit consider: "(1) whether the services were provided to benefit the estate generally or the

---

[8] "Subsection 503(b)(3)(D) represents an accommodation between the twin objectives of encouraging meaningful creditor participation in the reorganization process and keeping fees and administrative expenses at a minimum so as to preserve as much of the estate as possible for the creditors." Lebron v. Mechem Fin. Inc., 27 F.3d 937, 944 (3d Cir. 1994) (internal citations and quotation marks omitted).

11

party specifically; (2) whether services conferred a benefit upon the estate; (3) whether the services were duplicative of other parties' efforts; and (4) whether the services would have been provided absent an expectation of reimbursement." In re Grasso, 519 B.R. 137, 140 (Bankr. E.D. Pa. 2014); see also 4 Collier on Bankruptcy ¶ 503.10(5) (16th 2025). "The inquiry concerning the existence of a substantial contribution is one of fact, and it is the bankruptcy court that is in the best position to perform the necessary fact[-]finding task."[9] Lebron, 27 F.3d at 946.

2

The record supports the Bankruptcy Court's conclusion that the Coalition did not make a "substantial contribution" under § 503(b)(3)(D). See Boy Scouts II, 2023 WL 8449557, at *8 & n. 38 (citing Lebron, 27 F.3d at 944).

First, the Bankruptcy Court did not clearly err in finding that the Coalition's professional services did not "transcend[] self-protection" because they primarily benefitted the survivors rather than the estate. Boy Scouts II, 2023 WL 8449557, at *9-10. The Coalition's contention—that, by participating in the bankruptcy, it chose to save

---

[9] "[E]xpected or routine activities in a chapter 11 case—such as encouraging negotiation among parties, commenting and participating in successful plan negotiations, and reviewing documents—generally do not constitute a substantial contribution." In re RS Legacy Corp., No. 15-10197, 2016 WL 1084400, at *4 (Bankr. D. Del. Mar. 17, 2016); see also In re KiOR, Inc., 567 B.R. 451, 459-60 (D. Del. 2017) (declining to find a "substantial contribution" because "extensive participation in a Chapter 11 case, without more, is not a sufficient basis for 503(b) status"); In re Worldwide Direct, Inc., 334 B.R. 112, 125 (Bankr. D. Del. 2005) (declining to find that participation in negotiations satisfied "substantial contribution standard").

12

the Debtors from liquidation when it could have obtained higher recoveries for survivors in state court tort actions—is unsupported by the record. Instead, the Coalition's strategy appears to have been tailored to the Coalition's interest of maximizing survivors' recoveries.[10]

Second, there is no dispute that the Coalition's Verified Fee Statements included fees for professional services unrelated to the Coalition's contributions to the estate. Boy Scouts II, 2023 WL 8449557, at *8. In fact, the Verified Fee Statements submitted to the Bankruptcy Court include services provided to the Coalition that benefited only the State Court Counsel (e.g., services related to one law firm's individual advertising programs designed to generate clients and their clients (e.g., services related to opposing insurance companies' motion for discovery on the survivors and their counsel. Although the billing for services that furthered only the Coalition's self-interest is not dispositive, Lebron, 27 F.3d at 944, fees related to services that benefited only State Court Counsel and their clients are not reimbursable under § 503(b)(3)(D) because such services are not "actual,

---

[10] This conclusion is bolstered by evidence that the Coalition would have retained professionals "absent an expectation of reimbursement from the estate." Lebron, 27 F.3d at 944. The existence of a $2.4 billion dollar Settlement Trust, coupled with State Court Counsels' contingency fee arrangement, incentivized the Coalition to retain professionals to enhance the victims' and counsel's recoveries.

necessary expenses which were incurred 'in making a substantial contribution' in [the bankruptcy] case," id. at 943 (internal quotation marks omitted).

Third, the Bankruptcy Court did not clearly err in finding that the Coalition duplicated the work of other interested parties, notwithstanding the Coalition's significant role in the settlement negotiations with the Debtors' insurers. Boy Scouts II, 2023 WL 8449557, at *9. Participating in negotiations with other creditors is a routine task that does not rise to the high standard of a substantial contribution. See, e.g., In re Worldwide Direct, Inc., 334 B.R. 112, 125 (Bankr. D. Del. 2005) (declining to find that participation in negotiations satisfied "substantial contribution standard"); In re RS Legacy Corp., No. 15-10197, 2016 WL 1084400, at *4 (Bankr. D. Del. Mar. 17, 2016) (encouraging negotiation and reviewing documents "generally do not constitute a substantial contribution").

The declarations from the Future Claimants' Representative and his counsel demonstrate that the Coalition was not the only group of creditors involved in the settlement negotiations with the insurers. Furthermore, even though the Debtors and TCC did not participate in those negotiations, the Bankruptcy Court correctly observed that the requested fees covered work far beyond the settlements, and "[t]he Coalition's 'soup to nuts' approach to the case mirrored the work of an official committee." Boy Scouts II, 2023 WL 8449557, at *9.

In sum, because the record supports the Bankruptcy Court's determination that the professional services for which the Coalition requests fees (1) were "designed primarily

14

to serve their own interests," <u>Lebron</u>, 27 F.3d at 944, (2) were not actually or necessarily incurred in making a substantial contribution, and (3) were duplicative, the Bankruptcy Court did not clearly err in concluding that the Coalition did not make a "substantial contribution" under § 503(b).

III

For the foregoing reasons, we will affirm.